Campbell, J.:
Yroman and his deceased co-plaintiff below sued plaintiff in error to recover for a cause of action arising out of an alleged breach of warranty of a steam engine, purchased of the latter, and found so defective as, according to the claim, to be practically useless.
Judgment was recovered below for an amount which seems to be the original purchase money with interest, and error is brought for various causes, including an amendment in the name of the plaintiff in error, and certain rulings on the questions of warranty and damages, as well as on evidence, and on the form of the issues.
The pleadings, as first put in, described as defendant “William A. Tomlinson, as president for the time being of the Kimball & Austin Manufacturing Company, a company organized and existing under and by virtue of the laws of said state, and doing business at Kalamazoo in the county aforesaid.”
On the trial an amendment was allowed whereby Tomlin-son’s name and official character were stricken out, and the suit was left to stand as against the company by name. This was excepted to, as creating a change of parties.
The statute of amendments allows the correction of “ any *302 mistake in the name of any party or person.” — G. B., § 6051, Sub. 9. In the case of Final v. Backus, 18 Mich., 218, a mistake in a writ was corrected in the name of the original plaintiff, from Baxter to Backus, after defendant had entered default for want of declaration, and the declaration had been filed in the correct name of Backus. The ^default was opened, and after issue joined, the cause was tried on the merits, and on error the amendment was sustained. In Parks v. Barkham, 1 Mich. R., 95, an amendment was held good which changed the defendant’s name from James BarJeham, in the writ and affidavit for replevin, to Joseph Barkham, the process having been served on the right person but under a wrong name.
The statute was not intended to allow changes in the parties actually supposed and intended to be brought before the court. It is only in case of an undesigned misnomer, and where the interests of substantial justice will allow it, without a real change in the identity of the opposing litigants, that such amendments should be permitted. Where, however, no substantial rights are affected, and it is clear what persons were meant to be reached, the law permits the record to be rectified by affixing the true name to the misnamed party.
In the present case the suit was originally brought as it would have been proper to bring it against a joint stock association for manufacturing purposes organized under the law of 1846 (found in chapter Si of the Compiled Laws of 1871) entitled “ An act to regulate private associations and partnerships.” By section ten of that statute all actions against the company were required to be brought against the president for the time being, or some trustee, as nominal defendant, and it was provided that judgments, though in form against such officers, should take effect and operate against the company.
Such companies were not technically corporations, which could not in 1846 be created under general laws, but they resembled these as closely as was possible, and were very different from any ordinary private partnerships.
The declaration originally filed in this case was not drawn in such a way as to indicate the claim to be a personal claim *303 against Mr. Tomlinson so as to make the description personal and not official. It is so drawn as to show a purpose of enforcing a liability against an association, the name *of which was the Kimball Ss Austin Manufacturing Company, as the real defendant, represented for the single purpose of suit by Mr. Tomlinson, its president for the time being. The suit was, in legal contemplation, a suit against the association.
The mistake, then, was not in the name or identity of the defendant pursued, but only in regard to the statute under which it was organized as a corporation instead of an association closely resembling a corporation. The case shows that Tomlinson was president of the corporation, and that service was properly made on him as such. The form of his defense was representative and not personal, and under the statute, service made on him is good where the corporation is regularly sued.
In Sherman v. The Proprietors of the Connecticut River Bridge, 11 Mass. R., 338, the suit was orginally brought against “ The Proprietors of a Bridge over Connecticut River, between Montague and Greenfield, late in the County of Sampshire, and now in the County of Franklin.” Such a corporation had once existed for the purpose of building a bridge, but never built it and their charter expired. Subsequently another and distinct corporation called The Proprietors of Connecticut River Bridge was created, who built the bridge concerning which the action arose. The writ was served on the clerk of this latter company, but the suit was in form against the former which had ceased to exist. There was no legal identity or succession between the two corporations. Nevertheless an amendment was permitted whereby the name of the existing body was substituted for that of the expired corporation. The process having been served on the new company, it was held a common case of misnomer which justified the correction.
That case resembles this in its legal features, and goes beyond it in permitting a change where the record did not show any identity of names in the parties sought to be pur *304 sued. In the present ease the company named as defendant in its corporate capacity was named in a statutory *cliaracter of association as real defendant in the first place, and only sued by a representative instead of personally. No one could be ignorant of the real object of the suit, and the service was made precisely as It would have been had no mistake been made.
It seems to us that the case is fairly within the equity as well as language of the statute, and the amendment was rightly allowed.
The questions of evidence on which errors are alleged relate to proof of incorporation, and to the admissions or declarations of various persons, which are claimed to have been no more-than hearsay, as well as to the exclusion of some testimony offered.
The defendant’s counsel, having admitted its incorporation, objected to the production of the articles of incorporation. This testimony was properly received, as it would be absurd* to hold that any party by his bald admissions on a trial could shut out legal evidence. — John Hancock Mutual life Ins. Co. v. Moore, 34 Mich. R., 41. One very proper reason for desiring to introduce the document was to show the names of the corporators, some of whom acted in the bargain on which suit was brought.
In addition to evidence concerning the terms of the negotiation and the statements and representations attending it, the testimony showed that immediately after the first trial of the engine the purchasers complained of the failure to defendant, and its manager sent out a man named Charles Barrett to fix it. Evidence was given, under objection, of Barrett’s statements concerning the condition of the engine while working at it and trying it. The objection urged in this court is, that some of these statements were not made to plaintiffs but to strangers. In the court below no such ground was pointed out, and the objection was, that the statements were hearsay, and not within the scope of Barrett’s authority.
As Barrett was sent down for the purpose of rectifying any existing defect, and ascertaining for the benefit of all *305 *parties what ailed the engine, we can see no reason why all that he is sworn to have said should not he regarded as a part of the transaction which he was sent to carry out. The persons who reported the declarations seem to have been jointly engaged in the trial of the machine. There was also evidence tending to show further that plaintiffs were personally present at the experiments.
William R. Gibson, defendant’s foreman, was shown to have taken some part in the conversations which preceded the purchase of the engine in controversy, which was a secondhand engine and purchased as such. Gibson, when introduced by defendant as a witness, was asked by defendant’s counsel whether any thing was said about selling plaintiffs a new engine, and what it was ? The purpose of this offer, as expressed, was to show that plaintiffs declined to purchase a new engine and wanted a second-hand one. The court rejected the question. .
There certainly would have been no error in receiving this testimony, which related to a part of the negotiations, all of which were admissible. And inasmuch as other witnesses for the same party, who took a more active part in the business, were allowed to show the same facts, it is difficult to understand why it was excluded, unless, possibly, because Gibson did not have any thing important to do with making the bargain.
But we do not see how the exclusion of it damaged any one. The case showed by the testimony on both sides that plaintiffs understood they were buying a second-hand engine, made by some one else than the sellers, who were makers of engines, and of course in the habit of selling their own work. Willingness to buy a second-hand engine has no tendency to disprove evidence showing that it was represented as serviceable and perfect. If an engine is fit for use at all, it is fit for continued use, and there can be no presumption or probability that a good engine well used will be seriously impaired very soon.
It is only claimed that there was harm done by the exclusion of this testimony, because it *would have tended to contradict the testimony that this engine *306 was represented and believed to be substantially as serviceable as a new one. The witnesses were all heard concerning what was actually represented. We do not see how the expressed preference of plaintiffs for a second-hand engine could prove any more than their deliberate purchase of one, or could in any way tend to show that they did not want a good one.
The court also excluded the following questions put to Mr. Gibson: “What damage would the engine have been likely to have been exposed to in the hands of an incompetent engineer ? ”
It was claimed by defendant that the damage to the engine {which consisted in defects in the boiler and flues, and not in the machinery) was all caused by bad usage at the hands of the plaintiffs and their men, and that when they received the property it was in good order.
Gibson had testified very fully concerning the actual condition of the engine, and in what manner and by what misuse or aaegleet such injuries would be caused. All evidence offered to account for the state of things shown to exist was admitted, whether of eye-witnesses or of experts, and Gibson had explained his views fully on these matters. The damages which the engine had in fact suffered was fully shown by eyewitnesses. The causes of that damage were as thoroughly explained by skilled witnesses. The engine was in existence, and Gibson had seen it before and after its sale. Such a question as the court rejected was therefore entirely speculative and irrelevant. What might have happened was unimportant when the testimony showed plainly what had happened ; and whether such things showed incompetency or carelessness, was properly discussed by the witnesses in the light of the facts themselves.
The principal questions in the case are more or less connected with the nature of the representations alleged to have been made by defendant, and plaintiff’s rights under them.
The declaration contains two special counts — one alleging *that defendant warranted the engine to be in good condition, and in good runing order, and that it would do good work, and that if it would not do good work, *307 defendant would put it in condition to do so for the purpose for which plaintiffs required it. It avers that defendant deceived and defrauded plaintiffs, in that the engine was not in good condition or in good running order, or suitable for the required purpose, and defendant, though requested, did not put in such condition, etc., but the engine was old, the flues worn out and leaky, and the engine in bad condition and unfit for the required use, and became useless and of no value to plaintiffs, and they have been put to great charges and expenses, etc.
The second count was more specific, setting out the required purpose to be for running a threshing machine and detailing the various promises and breaches, with allegations that plaintiffs informed defendant of their own ignorance on the subject, and of their reliance on defendant.
There was also an averment in each count, of the payment of the whole purchase money, partly in cash and partly in a note paid at maturity. The declaration also averred, at the conclusion of the second count, the return and tender of the engine to defendant, and refusal to receive it or restore the consideration. • The common counts were also added.
There was testimony on the part of the plaintiffs which if believed made out a complete cause of action. This was contradicted on the part of the defense. The testimony on both sides showed that the chief defects were in the fire-box, boiler and flues, producing leakage of steam to such an extent as to destroy the effectiveness of the engine, and make it substantially useless to the purchasers. The unfitness was, if existing, not merely unfitness for a threshing machine, but unfitness for any useful work requiring the aid of such motive power. Upon the questions of fact, if properly submitted,, the finding establishes the deficiency of the engine when sold, and the warranty made and broken.
But one prominent point in controversy arises concerning *what is claimed to be an inconsistency in the plaintiffs’ claim. This is said to spring from the assertion under one part of the declaration of a right to damages under a contract, while on another theory the contract is *308 claimed to be repudiated for cause, and suit brought to recover back the consideration.
As the contract is fully set forth, the question whether upon a breach of warranty a right existed to return the property is one of law, and, as there was no acceptance of the return, if that right did not exist, then the averment of return- offered was surplusage and left the special counts as if it had been omitted; and the claim of too much would not vitiate the rest. If, on the other hand, it should be held that on a-bi’each of warranty the right to return existed, the question arises whether such return is in pursuance of the contract or in repudiation.
Where a paz-ty gives no warranty, but is guilty of such fraud as vitiates the contract, it is clear enough that the effect of the fraud is to authorize its entire repudiation. The grievance is, that the agreement as it turns out is not the agreement which the party supposed he was making. But where a warranty is given, the legal effect is usually, if not universally, to make the stipulation stand as security for pez-formance, and the injured party prosecutes his remedy upon it to enfoz;ce, and not to avoid the agreement.
While a right to return property which does not answer the assurazice is not always or generally expressed or implied in the warranty, yet if agreed upon it is in no way inconistent with a warranty. It is a very common thing to make warranties in that precise way, and to give the right to return in case of breach. Courts have undoubtedly multiplied dicta to the effect that such a return was a recission of the sale. But we think there is no warrant for saying that any action under a contract can be properly called action in avoidance of it. If the language is correct in any sense it can only mean that so much of the contract is rescinded as fixed the title in the purchaser. But if the *contract itself provided for a return of goods and did not at the same time provide that on such return the parties should be placed in statu quo, with no claims for further redress, any doctrine that holds the warranty discharged holds that paz’ties cannot make such agreements as they see fit to make for lawful purposes.
*309 The very object of stipulating for a return of property is frequently to relieve the purchaser from the burden of retaining or caring for something which, unless suitable to his needs, will be an annoyance or injury to him, which he would not voluntarily accept for any price. It may easily happen that the expense and trouble to which a purchaser is put by reason of the failure of his purchase to meet his expectations will ex-need the purchase price so much as to render its reimbursement an insufficient compensation, while the obligation to retain the article would be still more burdensome. There is no justice in such a case in compelling him to relinquish his actual damages as a condition of getting rid of an obnoxious and useless chattel. If a purchaser of tainted meat, or of a dangerous animal, which he cannot sell on any terms without doing harm to his neighbors, must keep it or forego all claims for damages beyond the price, his case is a very hard nne. We can see no reason in such a doctrine, and we do not find any such clear authority in its favor as to indicate that it belongs to the law. The cases which seem to favor such a rule do not, we think, really establish it. The dicta have mostly been thrown out on an entirely different issue, not raised here, namely, whether upon certain classes of contracts there is an implied warranty where none is expressed. There are some, no doubt, where tbe right to recover the price paid, without a return of the property, has been considered and denied. But this does not dispose of the real question whether the return and recovery are in affirmance or in avoidance of the contract, and whether the recovery is confined to the price paid, as money received for the purchaser’s use, and without consideration moving to him.
*The cases cited on the argument throw very little light upon this. But the case of Poulton v. Lattimore, 9 B. & C., 259, which has been fully approved, holds that there may be cases where a purchaser without returning an article may yet be allowed its cost. There in a suit for the price of seed, it was shown in defense, that the seed was warranted as good, new, growing seed. Defendant had planted part and sold the rest to others who planted it, and it all proved unpro *310 ductive. The jury found a verdict for the defendant, and it was held correct, and that the breach of warranty was admissible in defense without a cross action. In Grimoldby v. Wells, L. R., 10 C. P., 391, it was held that notice of refusal to keep was all the return required, and the vendor must take away his own property. In Head v. Tattersall, L. R., 7 Exch., 7, a party who had bought a horse under warranty that he had hunted with the Bicester hounds, with a right to return the horse if not answering the description up to the next Wednesday evening, returned him before Wednesday, but after the horse had, without plaintiff’s fault, been seriously damaged by an accident. The declaration was in the exact form of the one before us, containing one count for breach of wan-anty, one for such a breach with an allegation of return of the horse, and a count for money received to the plaintiff’s use. No one questioned the correctness of the declaration or claimed a misjoinder of causes of action; but issue was joined on all the counts, both generally and by special defenses, and a recovery was had for the price paid. A rule for a new trial was sought on the grounds that the horse was not and could not be returned in the same condition as when sold, and that plaintiff was only entitled on the evidence to nominal damages and not to the price paid; but a new trial was refused.
Although no question was raised on the declaration, that of' itself is of some significance where the cases show much attention was paid to questions of pleading, and the nature *of the controversy rendered it improbable that any defect would be overlooked.
The case of Heilbutt v. Hickson, L. R., 7 C. P., 438, is a recent and valuable case, showing the real character of these transactions. There the defendants agreed to sell plaintiffs 30,000 army shoes according to a sample shown them, to be inspected and approved before shipment, and payment made on delivery. Shoes were inspected, approved, and delivered at the appointed wharf in London and paid for. They were forwarded by plaintiffs to Lille to meet a contract they had made with the French government. After a considerable number had been delivered and sent forward, it was heard *311 that contractors had been punished in France for furnishing army shoes having paper fillings in the soles. Whether any shoe had these, could only be determined by cutting it open, which had not been done in any ease by plaintiffs’ inspector in England. On some discussion arising upon the subject, defendants wrote a letter to plaintiffs, agreeing to take back such shoes as were thrown back on his hands by the French authorities as containing paper, provided it was found in any large proportion. The French authorities rejected the whole invoices and left them in warehouse at Lille, and plaintiffs notified defendants they would have nothing more to do with them. They also did the same as to further parcels which had been delivered and paid for in London, but not shipped. The court held the inspection and acceptance in London did not cut off the remedy for the unknown defect not discoverable by that kind of inspection. It allowed a recovery, not merely for the price, but for damages, including forwarding, freight and insurance, and loss of profits which would have been received of the French government on the whole contract, including both such shoes as had been delivered and such as had not been delivered.
This decision is just, and is entirely inconsistent with the idea that a return of the goods is an ending of the ^contract. The remedy given could only be justified as the enforcement of an existing agreement, and the decision recognizes this as its foundation. The statement of the case is, that it was an action for breach of contract, and the pleadings were omitted on the expressed ground that they were immaterial, as the main contention was concerning the measure of damages.
We áre of opinion that the action properly lies for a breach of contract in case of a return, as well as in other cases, unless the whole contract is sought to be avoided. In this view there is no inconsistency in the joinder of counts, and the only further controversy where a case is made out of breach of warranty, would be concerning the measure of damages. In those cases where there is no right to a return, the damages may be, and perhaps generally will be, different from what *312 could be proper where the property is returned. And in cases of return it is also manifest that there may be differing rules applicable to different states of fact.
Complaint is also made of the character of the instructions touching what would amount to a warranty. It is claimed that the effect of the instructions and of the omission to give a number of separate requests was to confound the distinction between representations and warranties.
That distinction is well established, and if the charge was open to this criticism it was erroneous. Taking isolated passages it would seem so, but on a full comparison of the various instructions given, we think otherwise. The object of every charge is to present the questions to the jury in such a way as to lay before them the correct rules for their guidance in such a manner that they will be likely to comprehend them. Where, as in such cases as .this, representations may become warranties or not according to the understanding of the parties actual or presumed, or according to their known or supposed relative positions as to knowledge or ignorance, or the facilities of examination, or other facts which might qualify them, the method and order of expounding *the rules must be left very much to the discretion of the circuit judge. Appellate courts cannot lay down rules of rhetoric or logic in such cases, and can only inquire whether erroneous doctrine has been propounded. It may be that the most logical way of presenting qualifications is to state the rule with all its conditions in a single sentence. But it is not likely a jury or any other ordinary listener, not trained in the law, would catch at once and comprehend and remember, from a single oral statement, or from a series of separate theories, a rule thus briefly qualified. Experience has shown that to many if not to most persons, the qualifications themselves often need explanation and comparison, and unless fully and carefully handled are apt to escape notice. And it is not allowable to select particular assertions or rulings and treat them as isolated and independent propositions, when they are only parts of a chain of propositions, which when completed is a full and true exposition of the law. The multiplication *313 -of specific requests, .however correct in law, is much more likely to befog a jury than to enlighten them, and it is commendable, rather than erroneous, for a judge, so long as he covers all the ground, to combine such instructions as are pertinent, as far as he can, in one connected charge, instead of attempting to lay down a number of alternatives, in answer to questions.' In such a controversy as that before us, if there is any thing to be criticised, it is the tendency of the requests to run into abstract principles, rather than to the specific necessities of the issues of fact, which were very narrow and in no wise complicated except by conflicting evidence.
As we understand the bill of exceptions there were two substantial main issues, — one, whether the engine in question was warranted, and the other, whether the injuries to it occurred before or after the sale. The verdict of the jury upon the •second question is not impugned for any error in the charges. The warranty is therefore the principal matter before us.
The court charged on this head in substance, that on such *sales there was no implied warranty; that representations did not amount to warranties unless so intended, and so understood by both parties; that a warranty must be accepted by the purchaser as well as offered by the seller, and tiiat in determining the mutual understanding, the situation and the conduct of the parties at the time and afterwards was open to consideration, and that warranties might be made at any stage of the negotiations for sale before the conclusion of the purchase. Such we think is the understanding fairly to be deduced from the charges given.
We can see no error in these propositions against the rights of the seller of the engine. The only point which would apparently raise a doubt is on the effect of the subsequent conduct of the parties. But the testimony to which this referred was as to their mutual course when complaint was first made of the failure of the engine. The conduct of the agents of the company in regard to further repairs and trials was certainly very pertinent in showing how they looked on the facts, and amounted, if the jury believed the testimony for plaintiff below, to a practical admission of liability. There was nothing *314 to indicate any improper application of the rulings, and none was pointed out on the argument.
We think also that the court sufficiently called the attention of the jury to the difference between a warranty of general quality and fitness for work and one of fitness for a specific purpose. In directing the jury that in the former case the purchaser was not entitled to return the engine unless the representations were fraudulent, the charge went beyond the rights of the defendant below.
The warranty alleged, and which was supported by evidence which the jury must have found true, was not merely that the engine was then in good condition, but that if not, then it should be made so. This involved a future trial of the engine and future work upon it if needed, and to this extent placed it on the same footing as if they had *been contractors to furnish an engine of their own building, which the purchaser would clearly have a i-ight to return if not such as he had bargained for. Under such a contract the acceptance is necessarily conditional and does not bind the purchaser to keep what is not made to answer the agreement. On this there seems to be no doubt in the authorities.
Upon the rule of damages very little discussion is needed. If there was any warranty at all it was one which if broken justified a return of the property. This being so, and the purchase price having been shown, the plaintiffs were entitled to recover that at all events. The only charges complained of on this head related to a rule of damages applicable where no-return was allowable or offered. The case called for no such rulings. The jury have found no more than the purchase money and interest, and their finding cannot be impugned as the case stands. The errors were, if they exist at all, prejudieal to the defendant in error rather than to the plaintiff in error.
"We deem it proper to suggest, as has been done before on several occasions, that the multiplication of points and requests in cases where the issues are not complicated, is of injurious tendency and calculated to confuse both courts and juries, and impede the administration of justice. The jury must act in *315 their deliberations on the understanding which they derive from a single hearing of the charges and requests. Unless made plain to their understanding and expressed in such language as requires no interpretation to the laity, there is much danger that they will either be misled or disregard the instructions altogether and decide the case on what they conceive to be its general equities. There is no occasion on this record to image there was anything objectionable in presenting to the court the various propositions set out; but we cannot but think that specific charges on all of then! would have served no good purpose. We have discovered no failure to instruct the jury upon any * essential feature of the case, and it was not, we think, erroneous to abstain from doing more than was done.
We find no error, and the judgment must be affirmed, with costs.
The other justices concurred.