# CHARLES WEBSTER *vs.* P. W. MOORE & SON.

*Sale of Goods in Instalments—Failure of Buyer to pay for one Ship-
ment—Alleged Substitution of Inferior Goods—Waiver of Stipulation
as to time—Instructions to the Jury—Evidence to show quantity of
Canned Tomatoes—Letters as Evidence—Testimony as to fact Con-
ceded by Defendant—Defective Instruction cured by Verdict.*

If the buyer under a contract for the delivery of goods in instalments,
each to be paid for upon delivery, after paying for the first two instal-
ments, refuses to pay for the third, alleging that goods inferior to those
described in the contract had been delivered in all three shipments, and
demands that a reduction from the price be made on that account, the
seller has a right to rescind the contract as to the future deliveries for
such refusal to pay.

A contract for the sale of two thousand cases of canned tomatoes of a cer-
tain quality and according to sample, provided that they should be
shipped to the buyer in carload lots of five hundred cases, each lot to
be paid for on receipt of bill of lading.  The first two lots were paid
for, but upon receipt of the third car load of five hundred cases the
buyer refused to pay for the same, alleging that the goods received in
the first two shipments were not of the quality called for by the con-
tract and that the third lot also had been rejected by his sub-vendee
and claimed to be entitled to a deduction on that account.  The seller
denied this claim and refused to make the final delivery, although re-
quested so to do, and brought this action to recover for the third ship-
ment and a case of sample cans.  The defendant claimed to be entitled
to recoup against the price of the third car load lot, the damages result-
ing from the seller's failure to ship the fourth lot as also on account of
the inferior quality of those delivered.  *Held*, that the failure of the
buyer to pay for the third instalment, justified the seller in refusing to
make the fourth delivery, and that the defendant is not entitled to dam-
ages therefor by way of recoupment.

*Held*, further, that if the jury find that the tomatoes supplied by the
plaintiff in the three shipments were of the kind called for by the con-
tract and according to the samples approved by the buyer, then the
plaintiff is entitled to recover the contract price for them, but if the jury
find that the goods were not of such quality and kind, then the plaintiff
is entitled to recover the value of the five hundred cases in the third
shipment less any damage the defendant has sustained by reason of the
failure of the goods supplied to comply with the contract specifications.

When a contract for the sale of canned goods requires the buyer to fur-
nish his labels therefor promptly, that provision as to time is waived
by a subsequent delivery of the goods:

When the defendant, in an action to recover the price of goods sold and delivered to him, alleges that they were not of as good a quality as those he agreed to buy, a letter written by the broker who effected the sale complaining of the inferiority of the goods in certain sample cases, is admissible in evidence. But this letter may be explained by another letter of the defendant relating to the same subject.

A plaintiff in an action to recover the price of goods sold may be asked what the defendant owes him, when it appears from the other evidence that the object of the question is not to elicit the opinion of the witness as to the amount of defendant's indebtedness, but to show what goods had been delivered and not paid for.

The mere circumstance that one party to a cause concedes a certain fact does not preclude the other party from offering evidence of that fact since it is his right to present his proof to the jury in his own way.

When the defendant in an action to recover the price of a quantity of canned tomatoes delivered to him, alleges that they were not of the quality called for by the contract, the plaintiff, who was the packer of the goods, may show that he packed but one grade or quality of goods that year; that the work was done by competent employees, under careful supervision, and that a disinterested person examined samples from all the cases packed and found them to be of standard quality.

When the question in a case is whether certain cases of tomatoes sold and delivered to the defendant as being "Standard No. 3," were of that grade, evidence is not admissible to show that the plaintiff sold to third parties similar tomatoes as and for "Standard No. 3," since the sale of an article as being of a certain grade and quality, is not proof that it actually was of such grade and quality.

In an action to recover the price of canned goods, when under the contract the buyer is entitled to an allowance for labels furnished by him, a prayer is defective which authorizes the plaintiff to recover the contract price without deducting this allowance, But if it appears that the jury by their verdict did make this deduction, then the defect in the instruction is cured by the verdict.

*Decided November 12th, 1908.*

Appeal from the Circuit Court for Dorchester County (LLOYD, J.)

*Plaintiff's 6th Prayer.*—If the jury believe from the evidence that the three car loads of tomatoes or 1,500 cases admitted to have been delivered to the defendant by the plaintiffs on the 2nd, 8th and 23rd days of October, 1906, were No. 3 standard tomatoes, and were of the kind and quality of the

samples submitted to the defendant on the 8th day of September, 1906, and approved by him, then in that case, the plaintiffs are entitled in this cause to recover for the last car load of tomatoes or 500 cases containing 1,000 dozen cans delivered as aforesaid to the defendant on the 23rd day of October, 1906, at the rate of 77½ cents per dozen, with interest, if any as the jury may allow, and also to recover for the one case of sample tomatoes admitted to have been procured by the defendant or his agent and which was sent by the said Webster or his agent to a firm in New York, as shown by the evidence, at whatever price the said case may be found to be worth at the time of their said delivery to the said Webster or to his said agent. (*Granted.*)

*Plaintiffs' 10th Prayer.*—If they shall find from the evidence that the tomatoes sold and delivered by the plaintiffs to the defendant, if they find such sale and delivery were not No. 3 standard tomatoes and were not of the kind and quality of the samples submitted to the defendant of September 8th, 1906, and approved by him, and should further find that the defendant received the 1,000 cases of tomatoes shown by the evidence and admitted to have been shipped to Pittsburg, Pa., and 500 cases shipped to Philadelphia, Pa., and subsequently sold by them and received the money therefor, and paid for 1,000 of said cases but failed to pay for the other 500 cases, then the plaintiffs are entitled to recover the value of said 500 cases of tomatoes at the contract price less any damages if any that they may find the defendant to have sustained by reason of the said 1,500 cases of tomatoes not having been No. 3 standard tomatoes of the kind and quality of the tomatoes submitted, as aforesaid, on September 8th, 1906. (*Granted.*)

*Defendant's 2nd Prayer.*—That there is no legally sufficient evidence in this case from which the jury can find that the plaintiffs were entitled to rescind the contract or agreement offered in evidence as to the part thereof unperformed because of the failure of the defendant to pay for the third lot of tomatoes which were shipped to Philadelphia, and the jury must

deduct from any amount they find that Charles Webster is due the plaintiffs the difference in the contract price mentioned in the memoranda of sale offered in evidence and the market price of 500 cases of No. 3 standard tomatoes of the quality and grade mentioned in said memoranda, free on board, at Cambridge, Maryland, at the time they should have been delivered by the plaintiffs to the defendant. (*Rejected.*)

*Defendant's 4th Prayer.*—If the jury shall find from the evidence that the plaintiffs and defendant signed the memoranda of sale offered in evidence; that the plaintiffs, through Edgar B. Simmons, submitted to the defendant the samples as testified to in evidence; that the said samples so submitted were of a standard quality and were approved by the defendant; that the plaintiffs made the shipments of the tomatoes as mentioned in the evidence, under the direction of the defendant, 1,000 cases to James A. Elphistone, Pittsburgh, Pa., and 500 cases to Philadelphia, consigned to Jessup & Roberts; and shall further find that the tomatoes so shipped were not of a standard quality and were not equal in quality and grade to the samples submitted as aforesaid, then they shall deduct from any amount they shall find the defendant is owing the plaintiffs for the goods so shipped, the difference between the contract price of the tomatoes as stated in the said memoranda of sale and the market price at Cambridge, Md., free on board, of 1,500 cases of No. 3 tomatoes of the quality prescribed by said memoranda and as of the time of said shipments; (and if they shall also find that the defendant directed the plaintiffs to ship the remaining 500 cases called for by the said memoranda of sale, to his order, on or about the 19th day of October, 1906, and that the plaintiffs failed to so ship the said remaining 500 cases called for by the aforesaid memoranda of sale, they shall also deduct from any amount they shall find that the defendant is owing unto the plaintiffs as aforesaid, the difference in the contract price mentioned in said memoranda of sale and the market price of 500 cases of No. 3 standard tomatoes of the quality and grade as prescribed by the said memoranda, free on board, Cambridge, Md., at the time when

they should have been delivered by the plaintiffs to the defendant. (*Rejected.*)

*Defendant's 5th Prayer.*—If the jury shall believe from the evidence that the plaintiffs made the shipments upon the contract or agreement offered in evidence, on the 2nd, 8th and 23rd of October, 1906, as testified to in evidence; and shall further find that Charles Webster paid for the said shipments of the 2nd and 8th of October, as shown in evidence, but has not paid for the said shipment of October 23rd; and shall further find that Charles Webster, on or about the 10th day of November, 1906, after receiving said shipments made the claim to the plaintiffs that the goods so shipped, on the three dates aforesaid, were not of the grade and quality prescribed by the said contract or agreement, but were of an inferior grade and quality to that prescribed by said contract or agreement, and demanded of the plaintiffs that they replace the goods so shipped with other goods of the quality and grade prescribed by the said contract or agreement or claimed the right to recoup his loss because of the inferior quality of said goods out of the said shipment of the 23rd day of October or its proceeds, then the plaintiffs were not entitled to rescind the aforesaid contract or agreement as to the 500 cases that remained to be shipped after the said shipment of the 23rd of October, 1906. (*Rejected.*)

*Defendant's 6th Prayer.*—If the jury find that the plaintiffs received the labels referred to in evidence on or about September 20th, 1906, and that the plaintiffs made the shipments of tomatoes on the 2nd, 8th and 23rd of October, 1906, upon the orders of the defendant as testified to, that then the plaintiffs thereby waived all provisions of the contract or agreement offered in evidence, as to the time of the shipment of labels. (*Granted.*)

*Defendant's 8th prayer.*—If the jury shall find from the evidence that the 1,000 cases of tomatoes shipped to Pittsburgh by the plaintiffs, as testified to in evidence, (if they shall find the same), were not of the kind and quality of the samples submitted to the defendant on the 8th day of September

and approved by him, as testified to in evidence, if the jury shall find the same, but were of a grade and quality inferior to said samples and were not of the grade known in the canned goods trade as No. 3 standards, but were of a grade and quality inferior to what is known in the canned goods trade as No. 3 standards, then the jury shall deduct, from any amount they may find the plaintiffs are entitled to, the difference between what 1,000 cases of No. 3 standard canned tomatoes of the grade and quality of said samples would have been worth at Pittsburgh, and what they shall find the 1,000 cases mentioned in evidence as having been actually shipped from Cambridge to Pittsburgh were worth in Pittsburgh on their arrival at Pittsburgh; and if the jury shall also find that the 500 cases of tomatoes shipped to Philadelphia by the plaintiffs, as testified to in evidence, (if the jury shall find the same), were not of the kind and quality of said samples but were of a grade and quality inferior to same, and not of the grade known in the canned goods trade as No. 3 standards, but were of a grade and quality inferior to same, then the jury shall also deduct from any amount they may find the plaintiffs are entitled to, the difference between what 500 cases of No. 3 standard canned tomatoes of the grade and quality of said samples would have been worth at Philadelpha, and what they find the 500 cases mentioned in the evidence as having been actually shipped from Cambridge to Philadelphia were worth in Philadelphia on their arrival at Philadelphia. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON, and HENRY, JJ.

*F. H. Fletcher* (with whom was *P. L. Goldsborough* on the brief), for the appellant.

In the first bill of exceptions, the letter signed with the name "Edgar B. Simmons," dated Sept. 14th, was well calculated to injure the case of the appellant and prejudice

him before the jury. The apparent object of offering this letter was to confuse in the minds of the jury the sample cans submitted as the basis of the contract on the 8th of September, with the cans procured by the defendant on the 11th of September and sent by him to Austin, Nichols & Co., and to induce the jury to believe that the disapproval by Austin, Nichols & Co. of the quality of the cans sent them was the disapproval by the appellant of the quality of the sample cans submitted as the basis of the contract.

This letter of the 14th of September intended to refer, as the appellees well knew, to the cans sent to Austin, Nichols & Co., and not to the sample cans submitted as the basis of the contract, but the jury had no way of discovering this, as they were not permitted to have before them Mr. Webster's letter of the 13th of September, which was referred to in this letter of the 14th of September.

In the second bill, the witness, Perry W. Moore, one of the appellees, was asked the question, "What does Mr. Webster owe you?" This witness was permitted to answer this question despite the objection of the appellant, to which ruling he excepted. The witness' answer to this question was, "He owes us for 501 cases of tomatoes at 77½ cents per dozen."

The object of this suit was to determine, first, whether the appellant was indebted to the appellees, and secondly, if so, how much was he so indebted to them.

"The precise question which is to be determined by the Court and jury is by this interrogatory placed before the witness for his opinion and decision. To permit it to be answered is beyond all question against the great mass of authority in this and other States." *Belt R. Co.* v. *Sattler*, 100 Md. 335; *Western U. Tel. Co.* v. *Ring*, 102 Md., 681. The witness should have been confined to the facts and circumstances, and it was for the jury to draw the conclusion whether the appellant was indebted, and if so, in what amount, but the answer went to the whole contention and excluded the claims of the appellant, and even ignored the right to allowance of labels.

The questions asked in the third and fifth exceptions are the

same, but the tender of proof was slightly different.   In the third bill it was that the agreed price was "the full market price" at the date of the contract.   In the fifth bill it was that the agreed price was "fully equal to the market value."   The deposition in the fifth bill shows that the proof would have been that the agreed price was 2½ cents more than the market price.   If the question and answer objected to in the fifth bill had been allowed it would have thrown needed light upon the course of the market and the motives of the appellees.

A party has the right to develop his case, introduce evidence and marshal his testimony to suit himself by all legal evidence, irrespective of the admissions of the other side, as otherwise many very strong cases would be weakened and greatly emasculated by the admissions of the other side.   While it may be true that no evidence is required to prove an admitted fact and that no evidence will be admitted to contradict such admission coming from the party making the admission, yet one cannot, by admitting a fact, exclude proof offered by the other side.   *Kimball, etc., Co.* v. *Vroman*, 35 Mich. 310; *Jno. Hancock, etc., Co.* v. *Moore*, 34 Mich. 41; *Baumier* v. *Antiau*, 79 Mich. 509; *Decamp* v. *Schofield*, 75 Mich. 449.

Fourth and sixth exceptions.   As the letter signed "Edgar B. Simmons," dated September 14th, 1906, which was not really written by Mr. Simmons, but by his clerk, and which directly refers to a letter written to Mr. Webster was admitted on the offer of the appellees against the objection of the appellant, it became necessary, in order to explain this letter, to introduce the letter referred to in it, and the letter of the 14th of September being admitted, it was error to reject Mr. Webster's letter of September 13th, as in no other way could the jury have discovered that the tomatoes referred to in the letter of the 14th of September were from the one case lot delivered to Mr. Simmons after the contract and not the samples referred to in the contract.   *Roe* v. *Day*, 7 C. & P. 705; *Watson* v. *Moore*, 1 C. & Kir. 626; *Greenleaf on Evidence*, vol. 1, sec. 201.

Seventh exception.   Witness Perry W. Moore was asked

on rebuttal, "Describe how you packed your tomatoes in 1906, and state the quality and grade of your whole pack of that year?"

This case had nothing to do with the grade of appellee's whole pack, but only to do with the grade of the 1,500 cases delivered to the appellant. The question should have been confined to the quality of these 1,500 cases and should not have gone beyond that; to do so threw no light on any issue in the case, and tended to mislead the jury.

In the question in the eighth bill, Perry W. Moore, one of the appellees, was asked, referring to these 400 cases, "Please state whether or not the 400 cases which you had labelled with Mr. Webster's labels, the 'Rose Hill' brand, and which you did not ship to Mr. Webster because he had not paid for the third car of tomatoes delivered, were taken from the same pile of canned tomatoes in your warehouse from which the three car loads delivered to Mr. Webster were taken, and were of the same quality," to which the witness answered "Yes."

This case involves an inquiry as to the quality of the 1,500 cases delivered to Mr. Webster, not as to the quality of any cans that remained in the warehouse of the appellees after the 1,500 cases were removed. What light could be thrown on any issue in the case to establish the quality of these 400 cases which the appellees claim it was their intention to have delivered to the appellant if they had received payment for the third car, but which they never did deliver? The tendency of this question and answer was to injure the appellant and mislead the jury.

Ninth and twelfth bills. The appellees, long after refusing to deliver the fourth car, claim to have shipped the 400 cases, above referred to, to the Gowan-Peyton-Twoby Co., of Duluth, Minnesota. What light would it throw upon the case if said company received these 400 cases as No. 3 standard tomatoes? Such a question would only be misleading. To permit one of the appellees to state, as in this bill, that these 400 cases of tomatoes, in the judgment of the Gowan-Peyton-Twoby Co., were No. 3 standards, was to

sanction hearsay evidence, as this question directly asks, not for the opinion of the witness, but for the opinion of some other parties as to the quality of the goods referred to, and even without any proof that these other parties had ever examined the goods. Proof by the seller of the acceptance of these 400 cases by a third party as of a certain quality would not for the purposes of this case, in any view of it, be legal proof, or prove or tend to prove the quality of these 400 cases.

Likewise as to the twelfth bill—we fail to discover by what process of reasoning evidence merely that the appellees sold some 2,600 cases of tomatoes (but including no part of the 1,500 cases delivered to the appellant) as No. 3 standards could be admitted as evidence tending to prove that the 1,500 cases were standards, which were delivered to the appellant. Such a fact would not be admissible against the appellant even to prove the quality of the 2,600 cases so sold, if that were a material fact to this case, as the appellant was not interested in such sales, and it might very easily have been a fact that those tomatoes might have been sold as standards to other persons and accepted by them as such, and yet not really have been standards. Such evidence was very misleading and damaging to the appellant. If it were material to the issues to prove that the 2,600 cases referred to were of standard quality, such fact should have been established in the only legal way, by the evidence of those who had seen and examined them.

Tenth, eleventh, thirteenth and fifteenth bills of exceptions. The appellees claim to have had 2,600 cases of tomatoes in their warehouse after the 1,500 cases were delivered to the appellant. In order to prove the quality of the 1,500 cases delivered to the appellant the appellees attempt to show the quality of the remaining 2,600 cases months after the deliveries to the appellant, by examination of several sample cans taken from this lot of 2,600 cases, containing 62,400 cans. Surely proof of the quality of several sample cans taken from a lot of 62,400 cans in a warehouse would not prove or tend

to prove the quality of other lots aggregating 1,500 cases containing 36,000 cans, which had been removed from that warehouse months before.

Appellees' sixth and tenth prayers absolutely ignore the question of appellant's right to recoup for his damages arising out of appellees' refusal to deliver the fourth car of tomatoes, and amounted to an absolute ruling that the appellant was entitled to no damages for such refusal, yet the appellant specially excepted to the sixth prayer for this reason.

The appellant suffered considerable damages because of appellees' refusal to deliver this fourth car, for at the time this car should have been delivered, these tomatoes were worth f. o. b. Cambridge about 92½c per dozen, or an advance for these 500 cases of about $150. The amended contract called for four deliveries of equal amounts and fixed the time of the payment for each. On the failure of the appellant to pay for any one delivery the appellees might have been fully compensated in damages, and such failure would not authorize the appellees to refuse to make other deliveries, as there was no pretense that the appellant was other than a man of property and fully capable of fulfilling all of his contracts, as the only evidence on the subject so shows him to be as he really is. *Warfield* v. *Booth,* 33 Md. 71; *Anglo Am. Co.* v. *Prentiss,* 157 Ill. 520.

But there is another view. The great preponderance of evidence was that the tomatoes in the third car, as well as in the first and second cars, were not of standard quality and not of the quality and kind provided for in the contract. If such were the case, surely the appellant was not required to pay the contract price for the third car without deductions for the inferior quality of the goods already delivered. The evidence shows that the appellant offered to settle for this car after making deductions for his damages, but that the appellees would not settle. *Surely, under such circumstances, delay in settlement for this third car with claim for deduction did not warrant the appellees to refuse to perform the balance of their contract,* yet, these two prayers establish that doctrine without

submitting any facts to the jury, and regardless of the proof that appellant was always ready and willing to receive and pay for the fourth car.

This.case resembles in some particulars the principle established in *French* v. *Burr*, L. R. 9 C. P. 208, where there was a withholding of payment, for the first instalment delivered, under a claim of right to deduct for damages because of delay of delivery, JUDGE COLERIDGE, in delivering judgment, says: "*The true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract.* Now non-payment on the one hand, or non-delivery on the other, may amount to such an act, or may *be evidence for a jury* of. an intention wholly to abandon the contract and set the other party free." In that case the failure to pay for the first instalment was held, under the circumstances, not sufficient to warrant treating the contract as abandoned. *Benjamin on Sales*, sec. 789.

The same principle was laid down in *Corcoran* v. *Prosser*, 22 W. R. 222, where there was assertion of intention to deduct from the payment of the next instalment for deficiencies in prior instalments.

We find that the same principle established in these cases is followed in *Gill* v. *Vogler*, 52 Md. 665 (where the payments were withheld, because the work done was inferior to that provided for in the contract), and in *Bollman* v. *Burt*, 61 Md. 421, in which later case the contract called for 200 tons of iron to be delivered in quantities of about 18 tons per month, for which payment was to be made in cash at each delivery, as no time was fixed in the contract for payment, and JUDGE BRYAN in delivering the decision (at p. 421) says: "The deliveries of iron were to be made in monthly instalments, and the parcels delivered were to be paid for separately; the payment for one portion not being in any way dependent on the delivery of any other portion. In this respect the stipulations of the contract were clearly divisible, and a failure to make one delivery would not therefore necessarily affect the right and duty of the seller to make another, or the duty of the purchaser to receive and pay for another."

JUDGE BRYAN in this case clearly establishes the principle that a failure of the seller to deliver an instalment or of the buyer to pay for an instalment as provided for in the contract will not of itself warrant the other party in rescinding the contract, but that such default must be under such circumstances to evince an intention no longer to be bound by the contract. See 30 L. R. A. 70, for collection of authorities.

A case much cited in the Maryland Reports upon the right to rescind on default in delivering an instalment or in paying for an instalment, is *Withers* v. *Reynolds*, 2 Barn. & Ad. 882, which was considered in *Bloomer* v. *Bernstein*, L. R. 9 C. P., 588, in which the principle established in *Withers* v. *Reynolds* is said to be *the right of the seller to rescind when the inability of the purchaser to pay for future instalments is shown.* This is only an extension of the above principle and extends the right to rescind to cases where the other party has the shown or confessed inability to perform as well as in such cases where he refuses to be bound by his contract.

The Court in granting these two prayers supposed they were proceeding under the authority of the cases of *Baltimore City* v. *Schaub Bros.*, 96 Md., 546, and *McGrath* v. *Gegner*, 77 Md., 331, but a close examination of these two cases will show that the right to rescind in these cases was because of the shown or confessed inability of the one side to perform its part of the contract, or because of the intention evinced by acts not to be bound by the contract, or because of dependence of seller on payments for the means to purchase the subsequent material or supplies required by the contract. In neither of these cases was there any claim of right to with-hold part of the amount due because of any default on the part of the seller, as in the case at bar, and the decision in the Schaub case (at p. 554) expressly states that it is not meant to disturb the decision in *Gill* v. *Vogler*, supra. The dependence of the seller on obtaining the payments for deliveries to enable him to complete his contract seems to be the most potent fact in these cases. *Myer* v. *Wheeler*, 65 Iowa, 390.

The distinction has been drawn by the Supreme Court of

·the United States in *Norrington* v. *Wright*, 115 U. S. 188, be-'tween the effect of a default·in the delivery of one instalment 'as provided in the contract and a default in the payment for one instalment, as affecting the right of the party not in fault to rescind, in which case it is held that a default in such payment will not authorize a rescission ·by the other party while a default in one delivery may.    In JUSTICE GRAY'S decision in this case he says:

"The plaintiff in the case at bar greatly relied on the very recent decision in the House of Lords in *Mersey Co.* v. *Naylor*, 9 App. Cas. 434, affirming the judgment of the Court o Appeals in 9 Q. B. D. 648, and following the decision of the Court of Common Pleas in *Freeth* v. *Burr*, L. R. 9 C. P. 208."

"But the point there decided was that the failure of the buyer to pay for the first instalment of the goods upon delivering does not, unless the circumstances evince an intention on his part to be no longer bound by the contract, entitle the seller to rescind the contract and to decline to make further deliveries under it.    And the grounds of the decision, as stated by LORD CHANCELLOR SELBORNE in moving judgment in the House of Lords, are applicable only to the case of a failure of the buyer to pay for, and not to that of a failure of the seller to deliver the first instalment."

If there had been any suggestion in this case that the appellant was unable to pay, it might have been different, but the proof showed that he was ready, willing and prepared to pay for the fourth car and abundantly able to pay·for any other balance, *Benjamin on Sales*, sec. 789.

There was another error in these two prayers :    By the terms of the contract the appellant was entitled to an allowance off the contract price of 90 cts. per thousand for the 12,000 labels used in the third car, and the evidence showed that the appellant furnished the labels for the car, *yet, these prayers prohibited any such allowance.*

The sixth prayer allowed recovery at market prices for the one case delivered to Mr. Simmons.    This case was delivered on the contract and we fail to see why recovery should have been allowed for this case on a different basis.

There is another error in appellees' tenth prayer, where the words are used "*subsequently sold by them.*" This word "*them*" could only refer to the appellees and not to the appellant, and renders the prayer erroneous and misleading.

, *E. C. Harrington* (with whom were *Clement Sullivane* and *Mace & Harrington* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This is an action of *assumpsit* by the appellees to recover for 500 cases of canned tomatoes sold and delivered to the appellant. Both parties are packers of canned goods residing in Dorchester County, Md., the plaintiffs at Cambridge, and the defendant at East Newmarket. The memorandum of the contract, executed in duplicate, is as follows:

"Bought of Mess. P. W. Moore & Son, Cambridge, Md.

For account of Mr. Chas. Webster, East Newmarket, Md. 2,000 c's No. 3 Standard Tomatoes at 77½c per dozen f. o. b. Cambridge, Md. Cash less 1½ % in ten days from prompt shipment. Buyers labels to be put on free with an allowance of 90c per M. Subject to approval of samples submitted on September 8th, 1906. Prompt shipment of labels.

Duplicate } Accepted this 8 day of September, 1906. Chas. Webster, Buyer.
Accepted this 8 day of September, 1906. P. W. Moore & Son, Seller."

The sale wes made through Edgar B. Simmons, a canned goods broker, of Cambridge. The samples mentioned in this contract were duly submitted, and were approved on Tuesday following the 8th of September. Some days later, one case of 24 dozen cans No. 3 standard tomatoes were gotten by Simmons from the plaintiffs, to be used as samples by defendant in a contemplated sale by him to Austin Nichols & Co. of New York, but it does not appear that the plaintiffs knew to whom these smples were to be sent.

On September 14th the plaintiffs received a letter of that date, purporting to be signed by Simmons, but written and signed in his absence, and without his knowledge, by a clerk

in his office, saying, "I am in receipt of a letter today from
Mr. Chas. Webster, saying the samples you sent him were not
approved, as they were watery and juicy, and requested me to
see you and get you to send him more samples.    So please
send him another lot of samples at your earliest convenience,
and oblige yours truly."

Between September 8th and 14th the price of canned toma-
toes had materially advanced.

On September 15th, the plaintiffs wrote Simmons, "Yours
of the 14th inst. received, saying that Chas. Webster did not
approve the samples sent him; that they were too juicy; and
as the contract claimed approval of samples, and prompt de-
livery of labels which have not yet arrived, we therefore deem
the contract broken, and the aforesaid instrument is null and
void.   P. W. Moore & Son."

On September 18th Webster and Simmons went together
to see plaintiffs about the performance of the contract, and
Webster told them he had not rejected the tomatoes, and
insisted on their delivery; that Austin Nichols & Co., to whom
the last samples had been sent, had nothing to do with the
contract in question; that he, Webster, was the purchaser and
was perfectly satisfied with the tomatoes; that he then pro-
posed the tomatoes should be delivered in car lots—500 case
lots—f. o. b. Cambridge, payment for each car to be made on
receipt of bill of lading (thus modifying the terms of the mem-
orandum of sale).    The plaintiffs did not then agree to this
proposal, but did so agree on the following day, and so noti-
fied Webster by 'phone, and that the memorandum of Sep-
tember 8th was to be the guide as to kind and quality of
goods.    Two car loads of 500 cases each were accordingly
shipped on October 2nd and 8th respectively, and payment
therefor was made on receipt of bill of lading.

A third car load was shipped on October 23rd, and bill of
lading mailed to Webster, who refused to pay the contract
price therefor, because he claimed to have discovered since
paying for the two car loads, that neither these, nor the third
car were of the contract quality, whereupon the plaintiffs re-

fused to deliver the fourth car, though Webster demanded delivery thereof. The present suit is·for the contract price of the third car, and for the last mentioned case of samples. Webster claims to recoup against the price of the third car, the damages resulting from the alleged inferiority of all three cars and from the non-delivery of the fourth car.

The *nar* contains only the common counts and the pleas are the usual general issue pleas. The verdict and judgment being for the plaintiffs for the contract price of the third car load, and for the value of the last case of samples, the defendant has appealed. Sixteen exceptions were taken, fifteen to rulings upon evidence, and one to the ruling on the prayers.

The first exception was to the admission of the letter of Simmons of September 14th above quoted, in connection with the offer to show that Simmons was defendant's agent. Simmons himself testified that he represented both parties as broker, though his brokerage was paid by the plaintiff in accordance with the custom in such transactions. The manifest purpose of the introduction of this letter by the plaintiff was to lead the jury to believe, as the plaintiff may have believed, that Webster had rejected the samples submitted September 8th as the standard for the 2,000 cases then purchased, and thus to justify the plaintiffs in their attempted cancellation of that contract. Standing alone, and unexplained, it certainly tended to support the plaintiffs view, and we perceive no error in its admission.

After Perry W. Moore, one of the plaintiffs, had given his version of the transaction on examination in chief, his counsel then asked him, "What does Mr. Webster owe you?" to which question the defendant objected, but the Court overruled the objection, and after exception taken by defendant, the witness answered, "He owes us for 501 cases of tomatoes at $77\frac{1}{2}$c per dozen." This constitutes the second exception, the ground being that the purpose of the question and the result of the answer permitted, was to enable the witness to give his opinion and decision upon the precise question which was for the determination of the jury from a consider-

ation of all the facts and circumstances in the case.   If such
was the purpose and effect of the question and answer, the
ruling would be erroneous, as was held in *Belt R. R. Co.* v.
*Sattler*, 100 Md. 335, and in *Western U. Tel. Co.* v. *Ring*, 102
Md. 681.   But we do not think such was either the purpose
or effect of the answer elicited.   There was no dispute here
that 501 cases of tomatoes had been sold at $77\frac{1}{2}$c per
dozen, had been delivered, and had not been paid for in whole
or in part.   The only open question under the pleadings and
evidence for the determination of the jury, was what abate-
ment, if any, the defendant was entitled to from the contract
price of these 500 cases, by reason of the alleged inferiority of
the 1,500 cases delivered, and the non delivery of the remain-
ing 500 cases,   The question, we think, was equivalent to
asking what the plaintiff claimed to have been delivered, and
not paid for, and the answer given would have been strictly
appropriate and responsive to such a question.   Viewed in
that light, this exception bears no analogy to those in the two
cases relied on and cited above, and is not within the reason
on which they were decided.   It would be a narrow and ar-
bitrary construction of that question and answer to hold that
there was reversible error in their admission.

The third and fifth exceptions raise but one question.   In
the third, Simmons was asked "what was the value at Cam-
bridge of No. 3 standard tomatoes, f. o. b. cars on September
8th, 1906," for the purpose of showing that the contract price
was the full market price.   The plaintiff objected, but con-
ceded that the contract price was the full market price that
day, and the Court sustained the objection.

In the fifth exception while the deposition of a Mr. Jessup,
taken under a commission, was being read, the following
question was read, "What was the value of 3 ℔ standard
tomatoes at Cambridge f. o. b. September 8th, 1906."   The
answer in the deposition was, "75 cts."   The plaintiff objected
to the question; though the defendant stated he expected to
show by the answer that he had agreed to give a price equal
to the market price of that day, and the Court sustained the

objection on the ground that the matter thus proposed to be proved had already been conceded when the ruling on the third exception was made.

Upon principle it would seem that there ought not to be laid down a hard and fast rule compelling a party, against his will, to accept his adversary's concession of a bare fact sought to be proved, in lieu of the evidence by which the fact is proposed to be established. There are, no doubt, cases in which no actual injustice would be worked by such a rule, but there are others in which the strength of a proponent's case would be greatly weakened by its application.

The appellant has cited four cases in support of these exceptions, all from the Michigan Court, viz.: *John Hancock Co.* v. *Moore,* 34 Mich. 41; *Kimball Co.* v. *Vrooman,* 35 Mich. 310; *Decamp* v. *Schofield,* 75 Mich. 449, and *Baumier* v. *Antiau,* 79 Mich. 509.

In the first and second of these cases the concession would have operated to exclude record or documentary evidence. In the third, it was held that the conceding of a valuable consideration for a written promise, cannot deprive the promisor of the right to prove what the consideration was; and in the fourth it was held that though the defendant offered to admit that the plaintiff was kept out of possession of certain premises by him, plaintiff was entitled to give evidence of the fact and of the attending circumstances, the Court in that case using this emphatic language: "The right of a plaintiff to present his proof to the jury in his own way, subject to the rules of evidence, is a substantial and important one, of which he cannot be deprived by the proffered admission of the defendant." If this is the plaintiff's right, it is equally the defendant's right —the rule must be applicable to both parties alike. We have not been referred to any other decisions in point, and we have discovered none, nor have we found any consideration of this question in the text books or encyclopedias. The excluded answer showed that the contract price was $2\frac{1}{2}$c above the market price of that day, and thus illustrates the obvious difference in effect in some cases between a naked concession of

a fact, and the production of the evidence by which the fact is proposed to be established.    We have not had pointed out to us any specific injury worked to the defendant in this case, by the ruling complained of, and in the absence of injury the error cannot be held reversible; but we cannot give our sanction to the laying down of a general rule which would deprive a party of his right to produce to the jury in his own time and way the evidence upon which he relies, and which is legally admissible for that purpose.

The seventh, eighth, tenth, eleventh, thirteenth, fourteenth and fifteenth exceptions may be considered together.    They all relate to the admission of testimony by which the plaintiff sought to show that the 1,500 cases delivered were No. 3 standard tomatoes such as the contract specified.

In the seventh, one of the plaintiffs was asked to state "how they packed their tomatoes in 1906, and the grade and quality of the whole pack for that year."    The answer was that the whole pack was by hand, by girls, who weighed 34 oz. of tomatoes in each can; that witness personally supervised this packing, and that each day's pack was examined as packed, and that all were standards No. 3 of fair quality, except the last day's pack which were kept in a separate house, and none of which were delivered to the defendant.

The eighth exception relates to 400 cases labelled with defendant's labels and designed for delivery to him as part of the fourth car load, not delivered, because of his refusal to pay for the third car load.    The same witness (Moore) was allowed to state that these 400 cases were packed for Webster and taken from the same pile from which the three car loads were taken.

In the tenth exception, the same witness after stating that he had 2,600 cases on hand at the end of the packing season and that Wm. E. Hearn examined samples from these, including the 400 cases aboved mentioned, was allowed to state that some of the samples examined by Hearn were from the same lot from which the 1,500 cases delivered to the defendant were taken, this answer being allowed upon condition that it should be followed up by Hearn's own testimony upon that point.

In the eleventh exception the same witness was allowed to say that the quality of the samples examined by Hearn were all fair standards.

In the thirteenth exception Hearn was allowed to confirm Moore's statement in the eleventh.

In the fourteenth exception during the reading of the deposition of Thos. J. Burke, a canner of Duluth, it appeared that he was the vice-president and buyer for a canning company of that city, and bought from the plaintiff in July, 1907, 500 cases of Springfield brand canned tomatoes, and was allowed to state that he found them "satisfactory." And in the fifteenth exception he was allowed to say these tomatoes were good quality of standards, thus explaining what was meant by the term "satisfactory."

It is plain that the purpose of this testimony was to show that the 1,500 cases delivered were of the character and quality required by the contract. The objection made to all this testimony is that the issue in the case was the quality and character of the 1,500 cases delivered, and that this could not be established either by evidence as to the method pursued in the packing of that year, or by evidence as to the quality of any other part of the pack of that year, but after a careful consideration of this objection we do not think it should be sustained. It was not in the power of the plaintiffs to produce the tomatoes delivered to the defendant, and the evidence they offered was the best evidence obtainable. *Ames* v. *Quimby*, 106 U. S. 342. If they were not permitted to introduce that evidence, their mouths were sealed, except to affirm merely that the goods complied with the contract. Surely evidence that the plaintiffs packed but one grade and quality of goods that year, and this designated No. 3 standard; that the work was done by competent and careful employees, and under constant and careful supervision; and that a disinterested and competent person examined samples from all the 2,600 cases packed in addition to the 1,500 cases sold to the defendant, and pronounced them all to be good No. 3 standards, afforded some reasonable ground for the belief that they were all of the same grade and

quality, and constituted information which ought not to have been withheld from the jury, and in our opinion there was no error in these rulings.

The fourth and sixth exceptions were taken to the exclusion of the following letter offered in evidence by the defendant.

"East Newmarket, Md. 9–13 – 1906.
Mr. E. B. Simmons, Cambridge Md,
Dear Sir:

I enclose a letter received today from Austin Nichols & Co. concerning those samples sent by P. W. Moore. Surely those samples could not have been like those cut in your office. I regret that Austin Nichols & Co. should fail to approve these samples, as it may cause some delay in getting them out. However if Mr. Moore will send me another case of samples, I will see what I can do in other directions.

Yours truly, Chas. Webster."

It is apparent that this letter is the same referred to by Simmons in his letter of September 14th which had been previously admitted, and it at least tends to prove, if it does not conclusively prove, that the samples referred to in the letter of the 14th, inst. were not those sent with the contract in suit, but were those subsequently furnished, and sent to Austin Nichols & Co., not being connected in any way with this contract. The letter of the 14th, written by a clerk of Simmons, without his knowledge, or that of Webster, unexplained by this letter, tended to show an attempt by Webster to reject samples he had already approved as the basis of this contract, and it was offered with that purpose, in order to justify the plaintiffs in their proposed cancellation of the contract of the 8th inst. Simmons acted as agent for both parties in that transaction, and fairness requires that this letter of Webster to him, as such agent, should be admitted in explanation of Simmons letter of the 14th inst. The principle which so requires was applied in *Roe* v. *Day*, 7 Car & Payne, 705, and in *Watson* v. *Moore*, 7 Car & Kirwan, 627, cited in note to *Greenleaf on Evidence*, vol. 1, sec. 201.

In the latter case, a letter from defendant's attorney pur-

porting to be an answer to a letter to him from plaintiff's attorney, previously admitted, was objected to by the plaintiff but was admitted by CHIEF BARON POLLOCK, who said, "If you do not like to put in the letter of Messrs Frankum & Bartlett to which this is an answer, you should not give this letter in evidence. You should either put in both the letters or neither."

We think there was error in these rulings. The appellees contend that if admitted, it could not have affected the issues on any point, and was therefore not reversible error. But that ruling left the defendant under the imputation of bad faith in attempting to revoke his previous approval of the samples of the 8th inst, and it is impossible to determine how far his imputation may have affected the jury in their consideration of the defendant's good faith in his subsequent assertion that the three car loads delivered were inferior in quality to the samples by which they were sold.

The ninth and twelfth exceptions may be considered together.

In the ninth, Perry W. Moore was allowed to state that the 400 cases labelled for Webster but not delivered because he failed to pay for the third car, were subsequently sold to parties in Minnesota "*as* standard No. 3 tomatoes and were accepted by them as such."

In the twelfth, the same witness was allowed to state that in addition to the 1,500 cases delivered to the defendant, he packed that year 2,600 other cases, and had sold all these "*for* No. 3 Standards, and at No. 3 Standard Prices," without complaint as to any.

The issue involved in these exceptions was the quality and grade of the 1,500 cases delivered to Webster, and this could not be established by proof that any other part of their pack was sold and delivered *as* standards, even though without complaint by the purchaser. Selling an article *as* of certain grade and quality, is far from proof that it actually *was* of such grade and quality, and the evidence in this case shows that subequent to Webster's purchase the market price of canned

goods advanced largely, and so remained for a considerable period, a circumstance which always goes far to remove slight objections to defects, and to reconcile purchasers to contracts which they might otherwise seek to repudiate.

We think under the seventh, eighth, tenth, eleventh, thirteenth, fourteenth and fifteenth exceptions, the plaintiffs were allowed full latitude as to the proof of the quality and grade of the goods delivered to the defendant, and that there was error in the ruling on the ninth and twelfth exceptions.

This brings us to the rulings on the prayers.

Only the sixth and tenth prayers of the plaintiffs, and the sixth and eighth prayers of the defendant were granted, and by these we think the case was fairly and fully submitted to the jury. The defendant's sixth prayer is not important, but the granted prayers will be set out by the reporter.

The defendant objects to the plaintiff's granted prayers, on two grounds; first, that they ignore the right claimed by the defendant to recoup for damages growing out of the plaintiff's failure and refusal to deliver the fourth car of tomatoes, after defendant's refusal to pay for the third car delivered; and second, because he alleges that these two prayers do not direct or permit any allowance for the 12,000 labels used in the third car.

The first objection is disposed of by the case of *Baltimore City* v. *Schaub*, 96 Md. 535, and *McGrath* v. *Gegner*, 77 Md. 331. These cases determine that where a contract for the sale of goods to be delivered at successive periods, provides for payment at stated times after such deliveries, then if payment for goods delivered, is refused, such refusal is a breach of contract which justifies the seller in refusing to make further deliveries, and in an action by him to recover the price of goods delivered, the buyer is not entitled to recoup damages for failure to make further deliveries.

The second objection we do not think should prevail.

The tenth prayer, properly viewed and interpreted, contemplates the proper allowance for labels; it refers to the contract price, and the essential element of the contract price is the allowance provided by the contract for the labels.

The sixth prayer is defective in neither expressly providing for this allowance, nor in impliedly so providing, by reference to the contract, and if the verdict did not cure this defect, it would be ground for reversal if that was the only granted prayer. But it will be seen on reference to the verdict, and an examination of the calculation by which it was reached, the allowance for labels was made by the jury. Their verdict was rendered November 15th, 1907, for the sum of $813.22.

It was reached in this way:

1,000 dozen cans @ 77½c per dozen. . . . . . . . . . .$775.

1 case samples 2 doz. cans @ 77½c per dozen... . . .   1.55

$776.55

Credit allowance for 12,000 labels on 12,000 cans. . .   10.80

$765.75

The contract provided for an allowance of ten days for cash payment. The third car was shipped Oc. 23, 1906 so that interest should begin on Nov. 3, 1906. Interest on $765.75 from Nov. 3, 1906, to date of verdict, Nov. 15, 1907.. . . . . . . . . . . . . . . . . . . . . .   47.47

$813.22

which is the exact amount of the verdict rendered.

This demonstrates that the jury were not misled either by the omission of any reference in the sixth prayer to the allowance for labels, or by the obscurity of the reference thereto in the tenth prayer, and that they did in fact make the proper allowance therefor. There was thus no injury worked by either of these prayers.

The defendant's sixth and eighth prayers which were granted gave them all the law to which they were entitled.

The appellant's first prayer asserted that there was no legally sufficient evidence to show that the terms of the original contract were ever changed, and the seventh that there was no legally sufficient evidence under the pleadings to entitle the plaintiff to recover. These were not argued either orally or in

the appellant's brief, and were presumably abandoned. In any event they were properly rejected. The remaining prayers of the defendant all denied the plaintiff's right of rescission and were properly rejected.

For the errors in the rulings on the fourth, sixth, ninth and twelfth exceptions the judgment must be reversed.

> *Judgment reversed with costs to the appellant above and below, and new trial awarded.*