## SAMUEL M. LAWDER & SONS COMPANY vs. ALBERT MACKIE GROCERY COMPANY.

*Sales—Terms Cash—Delivery f. o. b.—Payment at Place of Shipment.*

A contract for the sale of a quantity of canned goods which designates the price per dozen and adds, "terms cash less one and one-half per cent," does not mean that the buyer has the option of either paying cash less the discount or of paying at the expiration of the customary period of credit for such goods without the discount, but the contract itself fixes the payment as cash with the discount allowed, there being no evidence in the case as to any usage of the trade affecting the construction of the language used.

A contract for the sale of goods made in Baltimore between a seller residing there and a buyer residing in New Orleans provided as follows : "Terms cash * * Buyer to give shipping instructions when requested by seller. To be delivered as packed during season of 1901, f. o. b. Baltimore." *Held,* that the seller was entitled to demand payment in Baltimore upon delivery of the goods for shipment and that the buyer had no right to require delivery to him in New Orleans and an opportunity to inspect the goods there before making payment, but should make such inspection as he desired in Baltimore which was designated in the contract as the place of delivery.

Appeal from the Court of Common Pleas (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and SCHMUCKER, JJ.

*George Whitelock* and *Edward I. Koontz,* for the appellant.

So far as the vendor was concerned, the time, place and mode of payment were the most essential stipulations of the contract. If the contract had been entirely silent in respect of these stipulations, the law would have expressed them in terms most favorable to the vendor, that is to say, it would have been entitled to payment in cash, at Baltimore, upon de-

livery.   There is no exception to the rule that, when time, place and mode of payment are not mentioned, payment must be made to the vendor in cash and at the time and place of delivery, as a condition, either precedent to or concurrent with delivery.   *Benjamin, Sales*, sec. 706 and 677; *Mechem, Sales*, sec. 1408.

In every sale, unless otherwise expressed, there is an implied condition that the price shall be paid before the buyer shall have the right of possession ; and this is a condition precedent.   The appellant did not, however, rely upon any implied right to cash payment, but that term was expressly incorporated in the contract.   There should be and there is no ambiguity as to the meaning of the word "cash."   The following cases illustrate the strict construction placed upon that word : *Dozet* v. *Qondry*, 21 Nev. 291; *Hall* v. *Storrs*, 7 Wis. 253; *Douglas' case*, 1 Wendell, 492; *Haggerty* v. *Foster*, 103 Mass. 19.   In *Hall* v. *Richardson* (16 Md. 412), it was held that the acceptance of a draft payable one day after sight made the transaction a credit sale.   Certainly merchants are not in the habit of placing in their contracts stipulations to which they do not attach some importance.   *Salmon* v. *Boykin*, 66 Md. 548.

The appellant must be presumed to have known that by delivering free on board, it would part with possession, and thereby lose its lien *in rem*, and vest the right of possession and the right of property in the purchaser, subject to a precarious and uncertain right of stoppage *in transitu.* *Benjamin, Sales*, secs. 804, 362, 363, *et seq.*; *Farmer's Phosphate Co.* v. *Gill*, 69 Md. 537; *Blackburn, Sales*, 200.   It was against this very consequence that the vendor should be presumed to have provided, when it stipulated for cash.   If the tomatoes had been placed on car, and then instead of informing the purchaser of that fact and of advising it that the tomatoes would go forward simultaneously with payment, the appellant had notified the purchaser of the loading and requested payment, the title would have passed at once to the appellee, inasmuch as unconditional delivery to the common carrier without more

would have vested the title in the purchaser, and it would have been held that the vendor had waived its right to cash payment at Baltimore. *Foley* v. *Mason*, 6 Md. 49. On the other hand, if the vendor had delivered the tomatoes free on board, and had then taken a bill of lading in its own name, there would have been a violation of that term of the contract which provided for delivery free on board at Baltimore.

The words "free on board," it is well settled, determine, *first*, that the shipper is to pay the expense of placing the cargo, on board; *secondly*, that the consignee is to pay freight to the common carrier; *thirdly*, that the shipment is an insurable risk in the hands of the purchaser, and, in the absence of evidence to the contrary in the contract, or in the circumstances, conclusively determines the question of time and place of delivery. *Benjamin*, *Sales*, secs. 372, 701, *et seq.; Am. & Eng. Ency.*, "*Sales*," p. 531, note 1.

The purchaser was not denied the right of inspection at Baltimore, where, in the absence of a contrary stipulation, and certainly under the special terms of the contract, he was bound to make it. *Benjamin*, *Sales*, p. 736; *Wadhams* v. *Balfour*, 32 Ore. 329; *Schouler*, *Personal Property*, sec. 406 (3rd ed.)

Furthermore, assuming that the purchaser had a plain right to inspect at New Orleans, the exercise of that right would not have been inconsistent with payment at Baltimore. Receipt and acceptance are in no sense correlative terms. There may be receipt without acceptance, and acceptance may be made without receipt. *Hewes* v. *Jordan*, 39 Md. 472. It will not do to say that the vendor might have had the bill of lading made out in its own name. This would have been a direct violation of the contract. In the very nature of things, the right to inspect was a condition subsequent to payment, inasmuch as by that means alone could all of the terms of the contract be preserved in their entirety. It is true that the purchaser would then have been obliged to maintain a suit against the vendor for any breach of the agreement to deliver quail tomatoes; inspection being then in theory, as it is invariably in practice, a condition subsequent. *Knoblauch* v. *Kron-*

*schnobel*, 18 Minn. 303; *White* v. *Harvey*, 85 Me. 212.  Such, however, is invariably the position of a jobber of canned goods.  The vendor could not require the purchaser of canned tomatoes, nor could the purchaser insist upon the right to examine all the goods (in this case necessitating an inspection of 16,800 separate cans) prior to the payment of the purchase price.  Certainly the right to payment must subsist independently of the right to inspect, and payment must be made at the time of delivery or in 10 days or 30 days or " on safe arrival," etc., as the terms of the contract provide.

*W. Calvin Chesnut* and *Stuart S. Janney* (with whom were *Gans & Haman* on the brief), for the appellee.

The quotation of a certain price for the goods and the stipulation for a discount in the same contract can only be given effect on the theory that the price named is to prevail in one contingency and the discount to be available in the event that contingency does not occur.  In other words, the discount must be a conditional concession.  It is common knowledge that in the different branches of mercantile trade custom prescribes different periods of time within which payment for goods purchased must be made, in the absence of express stipulation therefor in the contract itself.  In some cases it is 60 days; in others 30 days, and in still others 10 days.  But the customary period of credit for the particular trade is well understood by all who engage in it, and all contracts are made with reference thereto.

With this fact in mind the meaning of the contract becomes at once apparent.  52½ cents per dozen (if) cash less 1½ per cent, means nothing more or less than that the price of the goods, sold on the customary credit, is 52½ cents per dozen cans ; if, however, the purchaser desires to avail himself of the privilege of paying for the goods in cash he will be entitled to a rebate in the price of 1½ per cent.  The expression used is only a short form for that stated by Mr. Benjamin to be of frequent occurrence, namely, " cash less discount with option of bill."  *Bennets Benjamin, Sales*, sec. 706.

The identical custom was actually shown to exist in the coffee trade in this State.    The customary terms were proved to give the purchaser an option of cash payment less a certain discount, or of payment in bills of exchange at 60 days time at the price named.    *Williams* v. *Wood*, 16 Md. 220–54.

We do not mean to urge upon the Court the propriety of deciding in this case what is the real meaning of the terms employed in the contract.    Nor is it in any way necessary for it to do so.  The rule of pleading is well settled which requires a special plea to be taken most strongly against the pleader. *Poe, Pleading*, sec. 557; *Maenner* v. *Carroll*, 46 Md. 215.  The reason being that a party pleading must be supposed to have made his statement as favorable for himself as the truth will permit, and, therefore, it would be great injustice to the opposite party to infer that the truth is more favorable than the party himself has stated it.    *Dorman* v. *Elder*, 3 Blackf. 490; *Chitty, Pleading*, 261.

There is no authoritative compilation of such expressions, and any attempt to take judicial notice of their meaning is necessarily attended with great difficulty and must often lead to error.    Yet such would be the effect of upholding these pleas.    Such action would inevitably be a judicial determination that the phrase " 52½ cents per dozen, terms cash, less 1½ per cent, f. o. b. Baltimore," is identical in meaning with the phrase " 51 7-10 cents per dozen, terms cash, delivery at Baltimore, f. o. b.," and that such a method of expressing the latter idea is neither needful nor susceptible of explanation.    It would be a determination that the phrases are identical in meaning, *not* by the custom of merchants, but as matter of law.    And, if by the custom of merchants the meaning of the phrase should vary from that suggested by the appellant, the party depending upon that custom in making his contracts would be precluded from showing what it is.    His offer of testimony would be met by the objection that testimony of custom or usage is not admissible to contradict the terms of the contract itself.    And this case would be cited as a conclusive authority to the effect that the contract provides for pay-

ment in spot cash; that its terms are neither ambiguous nor uncertain, and that there is, therefore, no room for evidence of mercantile usage.

Even though the contract be regarded as providing for a cash sale, under the circumstances of this case the appellant was not justified in making demand for payment before the goods were shipped. A cash sale means, of course, a sale for cash, to be paid on delivery of the goods. The place of delivery, however, is often a matter of some difficulty to determine. It is undoubtedly a general rule that the place of delivery is the place where the goods are being manufactured. Though this rule is by no means invariable, since the situation of the parties, the nature and subject-matter of the contract, and many other collateral circumstances often show an entirely different intention to which the Courts give effect. *Mechem, Sales*, sec. 1124; *Bronson* v. *Gleason*, 7 Barb. 475.

There is a very wide distinction noted in the authorities between the rules governing deliveries in the case of a sale of certain specific and ascertained chattels, and in the case of a sale such as this, of goods not in existence but to be manufactured by the seller, to correspond with a description contained in the contract of sale. In the former case the title is transferred immediately upon the consummation of the sale and by the force of the contract itself, there remaining nothing to be done by either party with reference to the subject-matter. In the case of an executory sale of goods to be manufactured by the seller the rule is different. The goods are not in existence and the contract itself cannot in the nature of things transfer the title. In such cases it is held that in order to constitute a valid delivery and transfer of the title the goods must not only be manufactured by the seller but must be specifically appropriated by him to the contract, and must be *accepted by the buyer* as a fulfillment thereof. *Kelly* v. *Roberts*, 32 Vt. 272; *Moody* v. *Brown*, 34 Me. 107; *Gannage* v. *Alexander*, 14 Tex. 421; *Comfort* v. *Kursted*, 26 Barb. 472; *Atkinson* v. *Bell*, 8 B. & C. 281; *Miller* v. *Seamans*, 35 Atl. Rep. 134.

It is also held that in such cases the buyer has an absolute right of inspection before acceptance. He is not obliged to trust blindly to the seller's word that the goods resemble the description. He has a right, and a most important right, to examine the goods for himself and satisfy himself by such examination that it is proper to accept the goods as a performance of the contract. *Mechem, Sales*, sec. 1375; *Pierson* v. *Crooks*, 115 N. Y. 539; *Isherwood* v. *Whelmore*, 11 Mees. and Wels. 349. This right is a continuing one, and in a sale of goods to a distant purchaser it is exercisable at the destination or place of consignment, at which place acceptance or rejection by the purchaser is due. *Pierson* v. *Crooks*, 115 N. Y. 539; *Pope* v. *Allis*, 115 U. S. 372; *Fogel* v. *Brubaker*, 122 Pa. St. 7.

The law will hardly presume that the parties to the contract intended to provide for payment for the goods before acceptance. These two are, in the nature of things, concurrent acts. *Bennets Benjamin on Sales*, secs. 699–701; 2 *Schouler, Pers. Prop.*, sec. 416. The right of inspection being exercisable under this contract in New Orleans, and acceptance being due only after inspection, it follows that the title to the goods would not pass until they had arrived there and had been accepted by the purchaser as a compliance with the contract, or had been wrongfully rejected. The delivery, therefore, contemplated by the contract, was a delivery in New Orleans, and the seller had no right in any event to demand payment in Baltimore before shipping the goods, and thus cut off entirely the purchaser's right of inspection at New Orleans. *Eswin* v. *Harris*, 87 Ga. 336.

The letters f. o. b. are, of course, the usual mercantile abbreviation for the phrase "free on board." The expression is of such universal application and is so often met with that the Courts will take judicial notice of its significance. Its meaning in a contract of this sort is plain and well understood; f. o. b. Baltimore means nothing more or less than that the buyer is to pay the freight from that point, and that the seller is to pay all expenses up to and including the loading of the

cars.  13 *Am. & Eng. Ency. of Law*, 726; *Sheffield Furnace Co.* v. *Hull Co.*, 101 Ala. 481.

It was further contended in the Court below that it would be a great hardship to the shipper to compel him to send his goods to a distant purchaser without getting payment therefor before delivery; and that although he may have provided for a cash payment, he might be put to the trouble and expense of suing the distant purchaser in another State, and such contingencies are the very things provided against by a stipulation for cash payment, &c., &c.

This argument would be entitled to great weight if it were sound.  The fallacy lies however in that the result feared would not follow from such a ruling.  Mercantile usages provide very fully for just such emergencies.  There is nothing more usual than to send the shipping documents through banking channels to point of consignment with sight draft attached, the whole endorsed subject to inspection.  By such a method the seller is assured against loss, for the bank receiving the draft may not permit the goods to be taken without payment of the draft.  The purchaser has his opportunity to inspect at point of destination and the best results are obtained for all parties.  It is far more unreasonable to expect a distant purchaser to remit for goods when he has not even received the shipping documents, when the only evidence that the goods are in existence is the simple, unsupported word of the shipper that he has packed the goods on the cars, ready to go forward, and when no opportunity to inspect has been given.

BOYD, J., delivered the opinion of the Court.

The appellee sued the appellant for breach of a contract which is set out in the declaration as follows:

"*Baltimore*, May 24th, 1901.

"Bought of Samuel M. Lawder & Sons Company, Baltimore, Maryland, for account of Albert Mackie Grocer Company, Limited, New Orleans, La., seven hundred (700) cases, two pound, Quail Tomatoes, at fifty-two and one-half cents per dozen.  Terms cash, less one and one-half per cent.

Buyer to give shipping instructions when requested by seller. To be delivered as packed during the season of 1901. F. o. b. Baltimore.   Brokers Thompson & Fowler, New Orleans, La.
"Accepted.

"SAMUEL M. LAWDER & SONS CO.
"PERCY M. LAWDER, Pres."

The defendant filed in addition to the general issue pleas two that were marked 3 and 4, which were demurred to. The demurrer was sustained and, the other pleas having been withdrawn, judgment was entered in favor of the plaintiff for the amount of its claim, and from that judgment this appeal was taken.   The third plea alleges that the tomatoes referred to were purchased from the defendant on the terms and conditions contained in the contract set out in the declaration, and, as was known to the plaintiff, the defendant had then and still had its canning factory and place of business in Baltimore ; that the defendant had canned and packed the tomatoes for account of said contract, and on November 5th, 1901, in accordance with the precedent request of the plaintiff to make shipment of them, the defendant notified the plaintiff of its readiness to make delivery of said tomatoes free on board at Baltimore, which, as plaintiff was then informed, were loaded on a car ready to go forward simultaneously with payment in cash therefor at Baltimore, and the defendant requested the plaintiff to remit the purchase price thereof, to which request the plaintiff replied, "Will not pay for the tomatoes until the goods reach us."   It then alleges that the plaintiff failed and refused to make payment concurrently with such proposed delivery of tomatoes, and failed and refused to accept delivery of said tomatoes free on board at Baltimore for cash to be then and there paid.   The other plea was in substance to the same effect.

It is contended on the part of the appellee that this contract means that the sale was made at fifty-two and one-half cents per dozen, if paid for at the expiration of the customary period of credit for such goods, but if cash be paid there was to be a discount, or rebate of one and a-half per cent, but we cannot accept that as a proper construction of the contract.

The price of the tomatoes is stated to be "at fifty-two and one-half cents per dozen," and the terms mentioned are "cash, less one one-half per cent." There is not only no time fixed for payment on credit, but the contract itself fixes the payment as *cash*, and the addition of "less one and one-half per cent" clearly means that as the terms had been arranged for cash, the vendor had allowed that discount. We are not at liberty to read into the contract "*if* cash be paid a discount of one and one-half per cent will be allowed." If we did, when would the credit expire if the buyer elect not to pay cash? It will not do to say that that would be regulated by the custom of the trade, for in the first place the parties themselves have undertaken to fix the terms, and moreover there is nothing in the record from which we can infer, much less know, that there was any such custom. If there be such and the parties did not want to be governed by it, how could they more clearly express their intention than by the use of the expression "terms cash?" When contracting parties thus undertake to set out the terms of their contract and in stating when the payment shall be made simply say "terms cash," it excludes all idea of credit and when they add to that expression "less one and one-half per cent" upon what principle can the latter clause be construed to indicate an intention to give credit at the option of the purchaser? It is not difficult to understand what that expression means, if it be true that such goods are frequently or usually sold on credit. Brokers of course are kept informed as to the market price of goods they deal in. These brokers from New Orleans prepared this memorandum by which they proposed to buy of the appellant, for account of the appellee, the tomatoes at fifty-two and one-half cents per dozen, and if they had stopped there and it was proven that by the custom of the trade the purchaser was entitled to a credit of say thirty days, then presumably it would have meant that the sale was at that figure, payable at the expiration of that time. But the proposition of the brokers did not leave that to custom or usage, and named the terms. That was submitted to the appellant

and was accepted by it and the contract thus made first named the price of the tomatoes, which we presume was the market price, and then proceeded to agree upon the terms of payment which were to govern this particular transaction, stating that they were " cash " and they then agreed upon the discount, which was doubtless allowed by reason of the cash payment being agreed upon. If the contract had said " at fifty-two and one-half cents per dozen, less one and one-half per cent for cash " the contention of the appellee might have some foundation, but when the terms mentioned are " cash," and no suggestion of anything else, it would be striking down all the safeguards of a contract in writing to give the effect to the expression, " less one and one-half per cent," contended for by the appellee.   Even if it be possible to read into this written contract any usage or custom which might change its ordinary meaning, no such usage or custom is alleged in the pleadings, and we are only to pass on them as they are found in the record.   The case of *Foley* v. *Mason*, 6 Md. 37, to say the least would have made evidence of a custom on that subject very doubtful, if it had been offered.   See also *Gibney* v. *Curtis*, 61 Md. 201; *Susquehanna Fertilizer Co.* v. *White*, 66 Md. 456; *Balt. Base Ball Club* v. *Pickett*, 78 Md. 387.   As the case is now presented, it seems clear to us that the buyer did not have the option of either paying cash at fifty-two and one-half cents per dozen less one and one-half per cent, or having credit, without getting the benefit of the discount.

But it is contended that conceding that the appellant had the right to require the payment in cash, it could only be demanded after the tomatoes reached New Orleans.   We are, however, again confronted with the terms of the contract, in passing on that question.   It provides " Buyer to give shipping instructions when requested by seller.   To be delivered as packed during season of 1901.   F. o. b. Baltimore."   There is nothing in that language which would justify us in saying that the cash was not to be paid until the tomatoes reached New Orleans.   Indeed there is no express provision in the contract for shipping them to that city.   It may be said that

it states the residence of the buyer to be at New Orleans, and hence the presumption is that they were to be shipped there. In the absence of some instruction to the contrary from the buyer it may be that the contract should be construed to mean that they were to be shipped to that city, but as the seller was only required to deliver them " f. o. b. Baltimore " and the contract provided for the " Buyer to give shipping instructions when requested by seller " there would be no reason why the seller should not ship them to some other point, if so instructed by the buyer, unless such shipment would impose a greater burden on the seller than shipping them to New Orleans would have done.   If, for example, the buyer had sold those tomatoes in bulk to some one in Richmond, there could be no valid reason for the seller sending them to New Orleans and thus require the buyer to pay the freight to that place, and then reship them to Richmond.   It would seem therefore to be possible that the tomatoes might never have gone to New Orleans, under the terms of the contract, and hence it is difficult to see how it can be said that the cash was not to be paid until they reached that city.

But if it be conceded that the contract contemplated that the shipment should be to New Orleans, and not elsewhere, it cannot be denied that if the appellant had placed the tomatoes purchased, in proper condition, on board the cars at Baltimore, with correct shipping instructions, its responsibility would have been at an end.   The carrier would then have been the agent of the buyer and the seller would have had no redress against the carrier in case of loss.   If the goods had been destroyed or injured, the buyer and not the seller could have held the carrier responsible, so far as there was any responsibility, and if there was none the buyer would have been compelled to sustain the loss.   The seller would not even have had a lien on the goods for the purchase-money, and no right but that of stoppage *in transitu*, if circumstances arose that justified the exercise of that right.   When then the contract provides for payment of cash and only requires the seller to deliver the goods free on board at Baltimore, why should

the seller be required to wait until they arrive at New Orleans before it is entitled to its money? While the terms "f. o. b. Baltimore" required the seller to place, at its own expense, the goods on board in Baltimore, the buyer was required to pay the freight to the carrier and the goods were then at his risk. This contract not only uses the term "f. o. b. Baltimore" but it says "To be delivered as packed during season of 1901. F. o. b. Baltimore." In the record there is a period after "1901," but the expression "To be delivered," etc., unquestionably refers to and is connected with "f. o. b. Baltimore," and hence shows that the delivery was intended to be there. Although the sale was for cash, a delivery made unconditionally and without fraud or mistake would have vested the title to the goods in the appellee, *Foley* v. *Mason*, *supra*, and hence such a delivery in Baltimore would have had that effect, and a delivery elsewhere would not have been in accordance with the contract. It seems clear to us then that by the terms of the contract the payment was to be made in Baltimore upon delivery of the tomatoes on board the car and the appellee having refused, as alleged in the pleas, to make such payment, it cannot sustain this action, without in some way meeting the allegations of the pleas. Any other construction would be placing the appellant in a position not contemplated by the contract.

It was conceded by the appellee that a cash sale means a sale for cash to be paid on delivery of the goods, and that as a general rule the place of delivery is the place where the goods are being manufactured, but it is said that this rule is not invariable and may be affected by the situation of the parties, the nature and subject-matter of the contract, and other collateral circumstances which show a different intention, to which Courts give effect, and that there is a distinction noted in the authorities between the rules governing deliveries in sales of specific and ascertained chattels and those of goods not in existence, but to be manufactured by the seller to correspond with the description in the contract of sale. It is true that such a distinction is made in the absence of stipulations

in the contract which govern the parties, but when the contract itself prescribes the terms and these terms are free from doubt, they must be the guide for Courts in passing on the rights of the parties.

Great stress was placed on the right of the appellee to inspect the goods before acceptance. If it be conceded that it had such right, as it may be, the further question arises as to where, under this contract, it could be exercised. The mere fact that the buyer has the right to inspect goods before acceptance does not necessarily mean that the inspection is to be made at the residence or place of business of the buyer. He might inspect at the seller's place of business, but if the contract provides for delivery at a particular place, he must accept or reject at that place, unless otherwise provided for in the contract. In short a contract to deliver at one place cannot be said to mean delivery at another place, because the buyer lives there and has the right to inspect the goods, and there is no such uncertainty as to the place of delivery in this contract as would justify the Court in holding that it was at New Orleans, because the appellee had its place of business there. An inspection of canned goods at any place away from the canning establishment must be attended with some difficulties. Every can that is opened is doubtless injured for the ordinary purposes of trade, for unless it is speedily sold the fruit or vegetables must soon become worthless. There is nothing in the record to show what the custom is as to inspection and the parties made no special provision in the contract for it, but it is manifest that there could not be an inspection of every can in seven-hundred cases at the place to which they were to be shipped. But whatever inspection was to be made could have been done as well at the place from which the goods were shipped as at the point of destination, and it is mainly a question of convenience to the respective parties as to where it shall be made. If they determine that by their contract, it must control, and if it is silent as to inspection but it is as clear as this is as to delivery, any inspection that is desired before payment, must be made before or at the time of delivery, when the terms are cash.

It was said on behalf of the appellee that the usual method of collecting the purchase-money for such goods is for the vendor to draw on the vendee and not deliver the bill of lading until the draft is paid, but a sufficient answer to that is that it was not the method adopted in this contract. The standing of these parties is not known to us, and we do not mean to reflect upon either of them, but if a vendor wants to relieve himself of all risk of loss, or unfair dealing by a vendee residing at a distance, he has the undoubted right to require payment at the place where the goods are to shipped from, and not subject himself to the risk of loss or inconvenience by the vendee declining to accept the goods at the place of destination, and when the contract provides for that, as we think this does, the contracting parties are bound by it.

So without deeming it necessary to further prolong this opinion by considering such warranties as may be implied in sales of this kind, or other matters affecting the rights of the respective parties, we are of the opinion that the Court below erred in sustaining the demurrer to these pleas and the judgment must be reversed.

> *Judgment reversed and a new trial awarded, the costs to be paid by the appellee.*

(Decided April 1st, 1903.)