## HAZEL HILL CANNING CO., INC.,

### *vs.*

## ROBERTS BROTHERS.

*Contracts: construction.    Sales: discount for cash; not vendor's
option.*

In a contract of sale, "Terms, cash, less 1½%, 10 days,"
means that payment within ten days from delivery should be
treated as cash, and that such payment entitled the buyer to the
discount mentioned.                                    pp. 312-313

Such provision in the contract does not authorize the vendors
to draw on the vendee before delivery, for the price of the
goods less the discount, with the bill of lading attached; and
refusal to accept such a draft does not constitute a breach by
the vendee.                                               p. 313

Under such facts, when the vendors wired the railroad not to
deliver the goods, and notified the vendee that they refused to
make delivery, it amounted to a breach of the whole contract by
them.                                                    p. 315

*Decided November 15th, 1916.*

Appeal from the Superior Court of Baltimore City.    (AM-
BLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE,
THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Henry Zoller, Jr.* (with whom was *R. Ellsworth Jones*
on the brief), for the appellant.

*Wm. A. Wheatley,* for the appellees.

Boyd, C. J., delivered the opinion of the Court.

The appellant sued the appellees for an alleged breach of a contract, but a verdict was rendered for the appellees under instructions of the Court, and this appeal is from the judgment entered thereon.   The sale was by Henry Zoller & Co., merchandise brokers, and the following memorandum was made:

"Baltimore, Md., June 19, 1913.

"Sold for account of the Hazel Hill Canning Co., Inc., Fredericksburg, Va., to Messrs. Roberts Bros., Balto., Md., 5,000 Cases Standard No. 3 Tomatoes, 'Merry Mill' Brand, at 80c. per dozen f. o. b. Fredericksburg, Va., 1913 Packing, to be shipped during the packing season.   Usual six months' guarantee against leaks and swells.   Goods guaranteed to conform with the National Pure Food Law, June 30th, 1906.   Buyers to have the privilege of using their own labels, being allowed 90c. per 1,000 for same and Buyers' labels to be put on free of cost to Buyers.

"Terms: Cash, less 1½%, 10 days.

"Ship await instructions."

That was accepted by Roberts Brothers and signed by the brokers.   Three exceptions were taken to the rulings on the evidence and a fourth to the granting of two prayers, that the plaintiff was not entitled to recover—the only material difference between them being that the first did not refer to the pleadings, while the second did.   We will first determine whether they were properly granted.

J. J. Fisher, the secretary of the plaintiff, testified that the "packing season begins about August and ends about latter part of October.   As goods are packed we allow from two to four weeks to develop swells or leaks, after which they label the goods and put them in cases; that the Hazel Hill Canning Company proceeded to comply with said contract and received instructions in regard to it from the defendants."   On September 10th, 1913, Roberts Brothers wrote to the Canning Company:   "We are shipping you today by boat

to Fredericksburg, Va., labels to label up our purchase of tomatoes." That was acknowledged by a letter dated the next day, in which the Canning Company said: "We would appreciate it if you would be good enough to give us shipping instructions." On September 13th, Roberts Brothers wrote to the Canning Company: "We are sending you today instructions for three cars which amounts to 1,800 cases. You will kindly ship these out and by the time that you get them out you will kindly ask us for more instructions, and we will supply you with them * * * We are sending you more labels today by the boat." The instructions enclosed in that letter were as follows:

"Please ship via M. D. & V. Ry. Co. c. o. M. & M. T. Co., at Balto., c. o. Kanawha Des., c. o. Vandalia to Hulman & Co., Terre Haute, Ind., Big 'R' Brand. Consign from Roberts Bros., 1,800 cases Big 'R' Brand 3 lb. Tomatoes. Ship these in three cars of 600cs. in each car. Be sure and follow the above instructions to the letter.

"Contract No. ....          Roberts Brothers.

"*Important*—Mail Bill of Lading to this office promptly."

On September 15th, the Canning Company acknowledged receipt of the shipping instructions, and said: "Kindly give us a little fuller instructions, as we are at a loss to understand just how we can manage to ship in three cars of 600 cs. each car, when the shipment is to go part way by boat." To that Roberts Brothers replied on September 16th:

"Yours received and noted. You can just put 600 cases on the steamer which makes a minimum car, and let them come along, or you can put two 600-case lots aboard and make out the B-ls as you would to ship them by the car, showing the consignee and destination, but you will kindly not break either one of these lots, you must (send) 600 cases in each shipment. You can ship one, two or three cars at the same time aboard the boat, if you see proper, but you want sep-

arate B-ls and the consignee and destination on each
one of the 600 case lots."

Mr. Fisher testified that after receiving the shipping in-
structions he shipped 600 cases of tomatoes and he identi-
fied the bill of lading which was offered in evidence, "and is
a straight bill of lading—original—not negotiable, issued at
Fredericksburg, Va., on September 26th, 1913, by the Mary-
land, Delaware and Virginia Railway Company, showing the
receipt of 600 cases of Big 'R' Brand tomatoes No. 3 from
Roberts Brothers, to be delivered to Hulman & Company,
Terre Haute, Indiana. Route M. D. & V. Ry. Co., c. o. M.
& M. T. Co., at Baltimore, c. o. Kanawha Des., c. o. Van-
dalia." It was signed Roberts Brothers, Shipper, per Henry
Warden, and also by the agent of the carrier.

On September 26th the Canning Company wrote to Rob-
erts Brothers, stating that following their instructions they
had forwarded that day the tomatoes, and added: "Being
much in need of funds, we have today made a draft on you
for the amount, less 1½% ten days, and have attached Bill
of Lading to the draft, with instructions for the latter to be
delivered to you upon the acceptance of the draft." The
draft was for $945.60, payable ten days after sight to the
order of Planters National Bank, bill of lading attached.
On the back of it, when offered in evidence, were the words:
"Goods not purchased under these terms. Writing," signed
Roberts Bros. It was admitted that the amount of the draft
was for the contract selling price of the 600 cases, less
the 1½% provided for in the contract, but did not allow the
90 cents per thousand for the labels. On September 26th,
Roberts Brothers wrote the Canning Company, acknowledg-
ing its letter of that date, and added: "We have returned
the draft together with the B-L owing to the fact that the
goods were not purchased upon these terms. We don't have
to buy goods draft attached to B-L."

On September 27th the Canning Company replied as fol-
lows:

"We have your favor of the 26th instant, returning our draft not accepted by you. The explanation in your letter is not that noted on the draft. That in your letter may be correct, that you do not have to purchase goods with draft attached to bill of lading, but that noted on the draft is not correct. The goods were purchased under these exact terms. Our contract calls for cash in ten days, or a discount of 1½% at any time within ten days. We have exercised our option to take the cash at 1½ per cent. Such being the case, and your refusal being a repudiation of your contract, we have wired the M. D. & V. Ry. Co. as follows: 'Hold subject to our order 600 cases canned tomatoes shipped Roberts Bros. by Henry Warden, Fredericksburg, to Hulman & Co., Terre Haute, Ind.'"

On September 30th, the Canning Company also wrote as follows: "Enclosed please find the original Bill of Lading for 600 cases of Big R Brand No. 3 tomatoes shipped to Hulman & Co., Terre Haute, Indiana." Mr. Fisher testified that the bill of lading enclosed in that letter was the one offered in evidence, and was then unrestricted. He then identified the following letter from Roberts Brothers to his company, dated September 30th, 1913:

"Referring to the car of tomatoes that you shipped on our contract, we note that you shipped the same draft attached to B-L. As the goods were not bought this way, therefore we did not honor the draft.

"We further note that you say that you wired the Md. D. & V. Rwy. to hold subject to your order 600 cases canned tomatoes shipped *to* Roberts Bros. by Henry Warden, to Hulman & Co., Terre Haute, Ind. This matter is entirely up to you. We suppose that you have refused to ship Hulman & Co., Terre Haute, Ind., as per our instructions, so you will kindly return the shipping instructions that we gave you, please, as these people are in a hurry for the goods and we have sent the same down to one of our other factories

for shipment. So you will kindly make no further shipments, as we note that you have cancelled the contract."

On October 2nd, Roberts Brothers wrote:

"Yours received with enclosed B-L covering car of tomatoes that you shipped for our account to Hulman & Co., Terre Haute, Ind. We are compelled to return this as we have made other arrangements for shipping these goods. You did not ship the goods according to contract. From the tone of your letter we considered the contract cancelled and we have already confirmed the cancellation. We are sorry that you treated us this way. So we herewith return you your B-L as we can not use the goods."

On October 3rd the Canning Company returned the bill of lading to Roberts Brothers, and stated that:

"Until it developed from correspondence that you thought the terms of payment were different from what we took them to be, your refusal to honor our draft left us no alternative but to stop the goods in transit until it could be definitely ascertained what the trouble was with the draft. We yielded our views as to terms, accepting your interpretation of that portion of the Sale Memorandum and promptly released the goods that had been shipped. We therefore have to insist upon your making payment. These goods have gone forward on your order, labelled and stenciled according to your directions. We have a considerable portion of the balance of the quantity called for by the contract labeled and stenciled under your instructions. These facts sufficiently answer your suggestion that we are repudiating our contract. These goods go forward on what you have now explained as your construction of the terms of payment."

So far as appears from the record, that letter gave the appellees the first information that the appellant had "released the goods," and that they had gone forward, although according to the evidence that had been done on September 29th. The subsequent correspondence shows that the Canning Company was demanding performance of the contract and that Roberts Brothers claimed that the company had treated the contract as at an end, and they had affirmed its cancellation.

It is clear that the Canning Company had no authority under the contract to require Roberts Brothers to accept the draft as a condition precedent to obtaining possession of the bill of lading. There is no such provision in the contract, and there is nothing in the record to show, either that such had been the course of dealing between the parties or that there was such a custom, when the terms were such as those in this case. The shipping directions sent on September 13 included: *"Important.* Mail Bill of Lading to this office promptly." In its letter of September 15 asking for fuller instructions no suggestion was made that that would not be done, and it was not until it had sent the bill of lading with the draft attached that the appellees had notice of such intention. In *Lawder Co.* v. *Mackie Grocery Co.* 97 Md. 1, the sale was of "seven hundred (700) cases, two pound, Quail Tomatoes, at fifty-two and one-half cents per dozen. Terms, cash, less one and one-half per cent." We held that that could not be construed to mean that such a credit as the custom of trade allowed was given, and if cash was paid that a discount of one and one-half per cent. would be made, but that the parties having agreed that the terms should be "cash," "they then agreed upon the discount, which was doubtless allowed by reason of the cash payment being agreed upon."

In this case the contract reads, "Terms, Cash less 1½% 10 days." The meaning undoubtedly was that payment within ten days from delivery should be treated as cash, and such

payment entitled the buyer to the discount of one and one-half per cent. The parties did not agree that a draft should be attached to the bill of lading and that the latter should not be delivered until the draft was accepted. It might put a buyer to great inconvenience, or cause him considerable loss, if the seller without authority from the buyer could read that into the contract. The seller might be under contract to deliver the goods by a certain time to his vendee, and might be absent from home for a considerable part of the ten days, leaving behind him no one who was authorized to accept a draft, as a draft and acceptance had not been agreed upon or contemplated. If the seller intends to require the buyer to accept a draft, it is easy to so state in the contract if the buyer is willing, and if he is not willing such a contract will not be made by him.

In addition to what we have said, the draft was for more than was due. By the contract, the buyers were to be allowed 90 cents per thousand for labels used on the cans and furnished by them. As there were two dozen cans in a case and there were 600 cases in the shipment, there were 14,400 labels—for which the appellees were entitled to a credit of 90 cents a thousand, amounting to $12.96. The draft was for that much more than was due. That is not denied, but the secretary of the Canning Company testified that he did not deduct it, "as he thought that could be deducted on later shipments." That is not a large sum of money when considered in connection with a deal of 5,000 cases, but the appellant had no right to demand it and hold up the possession of the bill of lading until the draft was accepted, although the secretary knew it was for more than was due—even if he and the president did not know that they had no right to require the acceptance of a draft for the correct amount, which judging from their actions they did know. They stated in their letter of September 26 not that "in accordance with our contract" "we have today made a draft on you for the amount," etc., but "being much in need of funds we have

today made a draft," etc., and after they found the position they had put the company in they endeavored to revive the contract and were willing to accept the appellees' construction of it.

So there can be no doubt that the appellees were under no obligation to accept the draft in order to get the bill of lading, and the appellant had no right to impose that condition. If that were all, it might be argued that it would not be sufficient to authorize the appellees to treat the contract as rescinded or broken, but when the appellees, by letter of the same date as the one from the appellant notifying them of the shipment and of the draft, acknowledged its receipt and said: "We have returned the draft together with the B-L owing to the fact that the goods were not purchased upon these terms. We don't have to buy goods draft attached to B-L," and returned the draft with the endorsement mentioned above, the appellant wrote the letter of September 27th quoted above. It will be seen from it that the appellant not only asserted its right to require the acceptance of the draft, but telegraphed to the railway company to hold the tomatoes subject to its order, because, as it stated in the letter, the refusal of the appellees to accept was a repudiation of the contract. That letter is not in harmony with the one of October 3rd to Roberts Brothers in which the secretary wrote, "your refusal to honor our draft left us no alternative but to stop the goods in transit until it could be definitely ascertained what the trouble was with the draft." The proper course to have pursued was to inquire of the appellees, if they did not know, the cause of the refusal to accept when the draft was returned, but instead of doing that the President and Secretary of the company went to Baltimore on Monday, the 29th, and ordered the goods to be released, but did not even call upon the appellees, much less inquire of them why the draft was not accepted or notify them that they had released the goods. On that day while in Baltimore they had

the tomatoes forwarded to the address given by the appellees by the instructions of September 13th, and on September 30th they enclosed to the appellees the original bill of lading. On that day the appellees wrote to the Canning Company the letter quoted above. Those letters of September 30th apparently crossed each other, and on October 2nd the appellees wrote, returning the bill of lading and stating that they had made other arrangements for shipping the goods, and added: "You did not ship the goods according to contract. From the tone of your letter we considered the contract cancelled, and we have already confirmed the cancellation"— referring, as we understand, to their letter of Septmbr 30th.

The appellant treated the refusal of the appellees to accept the draft "as a repudiation of your contract," and for that reason wired the railway company to hold the tomatoes subject to their order. Although by the contract they were to be delivered at Fredericksburg, and the appellees were named as the consignors in the bill of lading, the appellant assumed control of them at Baltimore, had them shipped to Hulman & Co., at Terre Haute, and sold them to that firm "at 75c. per dozen, less Baltimore rate of freight." When that sale was made or how the appellant got possession of them, if the bill of lading sent to the appellees was still outstanding, is not explained. The appellant had no right to interfere with the shipment by the appellees to Hulman & Co., and under all the circumstances which we have stated we are of the opinion that the appellees had the right to rescind the contract when they did, and the subsequent attempt of the appellant to revive it, or correct its error, by sending the bill of lading without a draft attached, did not have the effect of giving it new life.

The contract in this case did not provide that the goods were to be delivered "by *stated instalments* which are to be separately paid for," and hence it is unnecessary to discuss section 66 of Article 83 (Uniform Sales Act), but if it had

so provided, or can be so construed, the circumstances of this case justified the appellees in treating the contract as re-scinded or cancelled, of which they gave the appellant prompt notice. If the construction put on it by the appellant was applicable to the shipment of the 600 cases, it was applicable to the 5,000 cases, and as the appellant treated the refusal of the appellees to accept a draft as a repudiation of the con-tract, and hence took control of the tomatoes, which they had held in Baltimore, there would seem to be no doubt that the appellees had the right to treat the whole contract as re-scinded. In *Enterprise Mfg. Co.* v. *Oppenheim,* 114 Md. 368, this Court, through JUDGE PEARCE, said: "In *Norring-ton* v. *Wright,* 115 U. S. 188, recognized as a leading case in this country, the Supreme Court held that in a contract for the sale and purchase of 5,000 tons of iron rails, with sub-sidiary provision for shipments in different months, and for payment upon each delivery, the seller's failure to ship the required quantity the first month gives the buyer the same right to rescind the whole contract that he would have had if it had been agreed all the goods should have been delivered at once, and that case has been approved and followed in *Salmon* v. *Boykin,* 66 Md. 550, and in later cases in this Court."

It was said that the principle involved had been recognized and applied in *McGrath* v. *Gegner,* 77 Md. 331; *Baltimore City* v. *Schaub,* 96 Md. 534, and *Webster* v. *Moore,* 108 Md. 595. JUDGE PEARCE also said: "It is quite clear upon princi-ple that there can be no valid distinction between the exercise of the right of rescission by the vendor for the failure of the vendee to pay for an instalment delivered, and the exercise of the same right by the vendee upon failure of the vendor to deliver an instalment of goods conforming to the article de-scribed in the contract."

Again he said: "This doctrine is applicable to failure in delivery of, or payment for, any instalment under the con-tract, whether the first, or any later one, the rights of the

parties being the same as to any unperformed part of the contract, as if that part had been the whole contract. *Cleveland Rolling Mills* v *Rhodes,* 121 U. S. 264; *Pakas* v. *Hollingshead,* 184 N. Y. 111; 3 L. R. A., N. S., 1042."

Even if there was error in any of the first three rulings, it could not affect our conclusion as to the right of the appellant to recover, and it is not necessary therefore to further prolong this opinion by discussing those exceptions. Being of the opinion that the Court was right in withdrawing the case from the jury, we will affirm the judgment.

> *Judgment affirmed, the appellant to pay the costs.*