## CHARLES F. ROBERTS ET AL.

*vs.*

## CHRISTIAN G. LINK ET AL.

*Sale of Tomatoes—Rejection of Installment—Effect—Authority of Agent.*

In an action for breach of a contract to buy from plaintiffs all tomatoes offered of a named grade, the evidence *held* sufficient to show that one employed by defendants for several years, whose duty it was to weigh and inspect tomatoes brought to their factory, and to reject those that he thought should be rejected, and who assumed, in the presence of one of defendants, to inspect a load of tomatoes offered by plaintiffs, had authority to reject them as not being up to the contract grade.

p. 681

A question asked of a witness as to his views of the legal effect of a rejection of a load of tomatoes when offered under a contract was properly excluded. 　　　　　　　　p. 682

In an action by the vendors of tomatoes for breach of the contract of sale, *held* that the refusal of the purchasers to take delivery of certain tomatoes tendered, the quality of which complied with the terms of the contract, was a breach of the contract "so material as to justify" the vendors "in refusing to proceed further and suing for damages for breach of the entire contract," as provided by Code, art. 83, sec. 66. 　　pp. 682-684

It appearing that, upon the purchasers' rejection of a load of tomatoes, being one of an indefinite number of installments to be delivered under a contract, as not complying with the contract, their representative was asked by the seller whether they intended in the future to "turn down" all tomatoes "of this grade," referring to the tomatoes then before them, and he answered "Yes," it was proper to refuse a prayer which submitted to the jury whether this did not mean merely that the purchasers would refuse to accept tomatoes not complying with the contract. 　　　　　　　　　　　　　　p. 685

*Decided February 16th, 1923.*

Appeal from the Superior Court of Baltimore City (AMBLER, J.).

Action by Christian G. Link and William J. Link, co-partners trading as Link Brothers, against Charles F. Roberts and others, trading as C. E. Roberts & Company. From a judgment for plaintiffs, defendants appeal. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*John Phelps,* for the appellants.

*John D. Nock,* with whom were *Benson, Nock & Rowe* on the brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

On the 13th day of May, 1920, the appellants, Charles E. Roberts & Co., packers of fruits and vegetables in the City of Baltimore, entered into a contract with the appellees, Link Brothers, growers of tomatoes, by which the former agreed to purchase of the latter tomatoes to be grown by them in said year. The contract was as follows:

"This agreement made this 13th day of May, in the year 1920, between Link Bros., parties of the first part, and C. E. Roberts Co., parties of the second part:

"Witnesseth that in consideration of $1.00 paid to each of said parties to the other, receipt of which is hereby acknowledged:

"Parties of the first part agree to grow on good manured land 15 acres of tomatoes during the season of 1920, and agree to sell and deliver all firm, red ripe tomatoes of good size for canning purposes, to the parties of the second part, at their factory located Fell Street.

"Parties of the first part further agree not to grow any tomatoes for any other parties than the said parties of the second part during the season.

"Parties of the second part agree to buy all firm, red ripe tomatoes of good size for canning purposes from said parties of the first part, at $1.10 per bushel during the season of 1920, and settlement to be made through S. F. Cromwell, Jr., commission merchants, of Baltimore, Md., who for the purposes of this contract are authorized agents for the same."

Pursuant to the above agreement, the appellees, in the spring of 1920, planted and cultivated fifteen acres in tomatoes and on the 10th day of August, 1920, they sent to the appellants, at their place of business on Fell Street, one truck load of tomatoes. The chauffeur, by whom the tomatoes were sent, found the packing house of C. E. Roberts & Co. closed. C. E. Roberts, a member of the firm, and the manager of that house, had not yet returned from the south, where he at that time was engaged in canning peaches.

The packing house adjoining that of the appellants was operated by The Fairbanks Company, of which O. P. Roberts, a member of the appellants' firm, was a member. The two houses are separated only by a narrow alley, which is used in common by the two firms. The Fairbanks Company's house was open at the time and, when the chauffeur drove in with the tomatoes, he was met by O. P. Roberts, who in the absence of C. E. Roberts, was acting for the firm of C. E. Roberts & Co. He examined the tomatoes and said that they were not up to the contract. He then called Cromwell, the commission merchant, over the 'phone, and said to him that he would take the tomatoes at the market price, and would continue to take them at that price until the return of C. E. Roberts, but that he would not take them at the contract price, and $.70 per bushel was the price agreed upon for those delivered on that occasion. In said conversation Cromwell asked O. P. Roberts to notify him when the C. E. Roberts & Company's house would be open and, some days thereafter, he received a letter from C. E. Roberts informing him that the house was open. Upon the receipt of this letter, Cromwell

wrote the appellees telling them that the house was open, and on the morning of the 18th day of August, 1920, the second load of tomatoes was carried by Link Brothers to the appellants. Other loads of tomatoes, that were gathered between the 10th and 18th of August, were sold upon the market. This was done because O. P. Roberts had said he would not pay contract price therefor, but would receive them and pay only market price for them, until the return of C. E. Roberts. On the morning of the 18th of August, the chauffeur, John Brown, was accompanied by Christian G. Link, one of the appellees, and when they reached the packing house of the appellants they were met by both C. E. and O. P. Roberts, who looked at the tomatoes in the truck, and C. E. Roberts said, as stated by Link, that the tomatoes did not come up to the contract. Link insisted that they did, and Roberts suggested that they take one of the baskets in the house and inspect it, which was done. The tomatoes were then culled by C. E. Roberts, he throwing out such of them as he thought did not come up to the standard mentioned in the contract, and, when asked by Link if he "meant to turn down tomatoes of that kind," said, "I do not intend to take any tomatoes of that quality whatever," and Link said, "Well, you do not want any tomatoes then." The tomatoes were then taken to Cromwell and were sold upon the market.

On the afternoon of the 18th, the third load was carried to the appellants. This time Link was accompanied by Joseph Smith, Cromwell's clerk, as well as by his chauffeur. On this occasion they were met by O. P. Roberts and Dunn, the son-in-law of C. E. Roberts, one who was known in previous years to weigh and inspect tomatoes for C. E. Roberts & Co., and to reject those that he thought should not be accepted. Four baskets were taken from the truck and dumped into baskets of the appellants, and examined by both O. P. Roberts and Dunn. At the conclusion of the inspection Link said he was told by Dunn that they would unload the tomatoes at market price, but not at contract price, and he replied, "No, you will

take those tomatoes at contract price, or not at all," and that he then said to Dunn, "Do you intend in the future to turn all tomatoes down of this grade," and Dunn said "Yes." Link then said, "Well, that settles it, that means to say you do not want these tomatoes on contract." Link, Brown, the chauffeur, Smith, Cromwell's clerk, and Sierwerski, a farmer, who were present and saw and heard what was done and said on the occasion referred to, corroborated Link in what he stated was there done and said at that time.

Dunn's version of what occurred on the afternoon of the 18th, when the second load of that day was carried to the appellants, differs from that of Link and those with him at the time. Dunn says that when the truck pulled in, he took off three baskets of the tomatoes and started to cull them, when he was asked by Link what he was going to do, and he replied that "he wanted to see what he was going to get," and Link said, "Well, what do you mean, what you are going to get, are you going to take them ?" By that time he had culled one basket and he said to Link, "I do not think you have come up to the contract," and Link said, "Well, I better put them on the wagon and I will take them back," and he (Dunn) said, "You better see Mr. Roberts," to which Link made no reply, but put the tomatoes on the truck and left.

The balance of the tomatoes grown by Link Brothers on the fifteen acres was thereafter, through Cromwell, sold upon the market, and each and every load sold brought the best price prevailing at the time of its sale.

The suit in this case was brought by the appellees to recover the loss sustained by them resulting from the alleged breach of the contract by the appellants, in refusing to take and pay for at the contract price the tomatoes grown by the appellees. The verdict and judgment being for the plaintiffs, the defendants have appealed. Twelve exceptions were taken, eleven to the rulings upon evidence and one to the ruling on the prayers.

The first exception was to the court's refusal to strike out the testimony of Christian Link, in respect to the conversa-

tion he had with Dunn, on the afternoon of the 18th day of August, with reference to the future delivery of tomatoes.

It is contended by the appellants that it was not shown that Dunn had the authority to speak for the appellants in saying that tomatoes of the grade tendered would not be received under the contract, and consequently the appellees were not legally justified in their subsequent conduct in not carrying their tomatoes to the appellants. In this contention we cannot agree with the appellants. It was shown that Dunn had been employed for years prior thereto by the appellants and that his duty was to weigh and inspect the tomatoes as they were brought to the factory and to reject those that he thought should be rejected. It was also shown that on the occasion referred to, the afternoon of August 18th, he, in the presence of O. P. Roberts, one of the appellants, assumed to inspect the tomatoes offered by the appellees for the sole purpose of ascertaining whether they were up to the standard fixed by the contract, and after he had examined them, he said they were not up to that standard. It was then that Link, who had twice before carried tomatoes to the appellants, which were on both occasions rejected, the first time by O. P. Roberts, and the second time by C. E. Roberts, asked if tomatoes of the grade then tendered would in the future be rejected, and he was answered "Yes." Smith thought the answer came from Roberts himself, though the other witnesses said it was Dunn who answered. But be that as it may, Roberts participated in the inspection of the tomatoes by Dunn, and though it is not definitely shown that he was present at the time the question was asked and answered, we think it may be reasonably inferred from all the evidence that he was, but whether he was present at that time or not, the evidence, we think, is sufficient to show that Dunn had the authority to answer the question and thereby bind the appellants, his employers. In any event Link had the right to infer from the conduct of Dunn and other facts and circumstances in the case, that were known to the appellants, that he had such authority. The

question presented in the second, fourth, eighth and eleventh exceptions is the same as that presented in the first, and we find no error in the court's ruling upon the third exception, which relates to the qualification of an expert witness.

As to the fifth exception there does not appear to have been any ruling of the court to which an exception could have been taken. And the same may be said of the sixth exception.

In the seventh exception, Cromwell, a witness for the plaintiff, while upon cross-examination, was asked his views as to the legal effect of a rejection of a load of tomatoes when offered. An objection to this question was, we think, properly sustained and there was no error in the court's ruling upon the ninth exception.

This brings us to the rulings upon the prayers. The plaintiff offered but one prayer, which we think correctly states the measure of damages.

The defendants offered seventeen prayers, five of which were granted and the others were rejected.

The main question presented by this appeal is whether the failure of the appellants to accept and pay contract price for the tomatoes tendered was a breach of the contract and, if so, was it such a breach as to justify the appellees in their failure to tender more of the tomatoes to the appellant and to treat the contract at an end, and to sue for and recover any loss sustained by them because of such breach.

The tomatoes in this case were to be delivered to the appellants as they ripened, and the appellees were to be paid therefor $1.10 per bushel, "settlement to be made through S. F. Cromwell." The contract is silent as to when the settlements were to be made, but it appears in the record that, by the custom of the trade in such cases, settlements are made at least once every month and more often if desired by the grower. That in such cases the grower is given a memorandum by the packer containing the amount of such load delivered and the amount owing therefor, and this the grower may at once carry to the commission merchant and obtain the

money thereon, or he may hold the same and at the end of the month he will be paid.

Section 66 of article 83 of the Code, provides:

"Where there is a contract to sell goods to be delivered by stated installments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more installments, or the buyer neglects or refuses to take delivery of or pay for one or more installments, it depends in each case on the terms of the contract and the circumstances of the case whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken."

It is claimed by both the appellants and the appellees that the above section of the Code applies to the case before us. If so, under the terms of the contract and the circumstances of the case, we think the refusal of the buyer to take delivery of the tomatoes tendered, if the quality of the tomatoes was in compliance with the terms of the contract, was a breach of the contract "so material as to justify" the appellees "in refusing to proceed further (after such breach), and suing for damages for the breach of the entire contract."

But the law applicable to a case of this character seems to be well settled in this State.

In the case of *Hazel Hill Canning Co.* v. *Roberts Bros.*, 129 Md. 306, CHIEF JUDGE BOYD, speaking for the Court, said:

"In *Enterprise Mfg. Co.* v. *Oppenheim*, 114 Md. 368, this Court, through JUDGE PEARCE, said: 'In *Norrington* v. *Wright*, 115 U. S. 188, recognized as a leading case in this country, the Supreme Court held that in a contract for the sale and purchase of 5,000 tons of iron rails, with subsidiary provision for shipments in different months, and for payment upon each delivery, the seller's failure to ship the required quantity the first month gives the buyer the same right to

'rescind the whole contract that he would have had if it had been agreed all the goods should have been delivered at once, and that case has been approved and followed in *Salmon* v. *Boykin,* 66 Md. 550, and in later cases in this Court.'

"It was said that the principle involved had been recognized and applied in *McGrath* v. *Gregner,* 77 Md. 331; *Baltimore City* v. *Schaub,* 96 Md. 534, and *Webster* v. *Moore,* 108 Md. 595. JUDGE PEARCE also said: 'It is quite clear upon principle that there can be no valid distinction between the exercise of the right of rescission by the vendor for the failure of the vendee to pay for an installment delivered, and the exercise of the same right by the vendee upon failure of the vendor to deliver an installment of goods conforming to the article described in the contract.'

"Again he said: 'This doctrine is applicable to failure in delivery of, or payment for, any installment under the contract, whether the first, or any later one, the rights of the parties being the same as to any unperformed part of the contract, as if that part has been the whole contract. *Cleveland Rolling Mills* v. *Rhodes,* 121 U. S. 264; *Pakas* v. *Hollingshead,* 184 N. Y. 111; 3 *L. R. A. N. S.* 1042.' "

If the rejected tomatoes were up to the standard fixed by the contract there was not only a breach of the contract, but it was one that certainly justified the appellees in treating the contract as ended and in going no further with its fulfilment, if the statements of the appellees' witnesses as to what was said and done, at the time of the rejection of the tomatoes, were found to be true.

The question as to the binding effect of Dunn's statement to Link upon the appellants is presented by the defendants' ninth prayer. This question is fully covered by the discussion of the first exception.

The twelfth prayer of the defendants attempts to give the statement made by Dunn to Link, as stated by the latter, at the time of the tender of the load of tomatoes on the afternoon of August 18, and though it incorrectly states it, the

prayer asks that the jury be told that if they find that the statement, under the circumstances, was intended to mean, and was or should have been understood by the plaintiffs to mean, that the defendants would not accept delivery of tomatoes which did not comply or materially comply with the contract, that then the plaintiffs were not justified in refusing to make further delivery and their verdict must be for the defendants. Dunn was asked, "Do you intend in the future to turn all tomatoes down of *this grade,*" and he answered "yes." Both the question and answer had special reference to the tomatoes then before them, and the plain inquiry was, did he intend in the future to turn down all tomatoes of that grade. The inquiry was not whether he would turn down tomatoes that did not come up to the contract, but whether he would in the future turn down tomatoes like those before him—tomatoes of that grade. Moreover, the prayer rests the right of the appellees to rescind the contract solely upon what was said by Dunn, without regard to, or his connection with, others.

There are a number of other rejected prayers, all of which we have carefully examined, but have been unable to find any reversible error in the refusal of any of them.

The judgment of the court below will therefore be affirmed.

*Judgment affirmed, with costs.*